SPECHT *v.* THE COMMONWEALTH.

The 1st section of the act of the 22d of April, 1794, prohibiting the performance of any worldly employment or business on the *Lord's day*, commonly called *Sunday*, works of necessity or charity only excepted, is not in conflict with the 3d section of the 9th article of the constitution of Pennsylvania, and is constitutional.

Members of a society or sect, who conscientiously observe and keep the seventh day of the week as the Christian Sabbath, are, upon conviction for violating the first day of the week or Sunday, by working or performing any worldly employment, amenable to the penalties inflicted by the act of Assembly.

The 1st section of the act of the 22d of April, 1794, only selects and sets apart *the first day of the week*, or *Sunday*, as a day of legalized rest, and enforces the observance thereof by legal sanctions; and is, essentially, but a civil regulation made for the government of man as a member of society.

IN error from the Court of Common Pleas of Franklin county.

*June* 8. This case came into the court below on *certiorari* to George W. Toms, Esquire, a justice of the peace, to return the proceedings in a certain prosecution before him, at the suit of the Commonwealth, against one Jacob Specht. The justice, thereupon, returned the following proceedings:—

"Be it remembered, that on the 17th day of August, A. D. 1846, Jacob Specht, cooper, was charged, on the oath of John Lidy, with having done and performed worldly employment and business on the Lord's day, commonly called Sunday; with having been working at hauling manure on Sunday, 16th day of August, in said year 1846. Warrant issued on the 17th day of August, A. D. 1846, to Hugh M. Sibbet, constable of Quincy township. And now, this 20th day of August, A. D. 1846, the defendant is brought before me; and on the proof of having been engaged in worldly employment, in hauling manure, at the township of Quincy, in Franklin county, and commonwealth of Pennsylvania, on Sunday, the 16th day of August, A. D. 1846, on the oath of said John Lidy, and therefore it is considered and adjudged by me, George W. Toms, one of the justices of the peace of the county of Franklin aforesaid, that the said Jacob Specht, cooper, according to the form of the act of Assembly in such case made and provided, be convicted of having done and performed worldly employment or business, not being a work of necessity or charity, on the Lord's day, commonly called Sunday. And I, the said justice of the peace, do therefore adjudge him, the said Jacob Specht, to pay a fine of $4, which sum, by so doing and performing, he, the said Jacob Specht, hath forfeited, to be distributed as the act of Assembly directs."

It appeared that on the trial before the justice, the defendant tendered the following plea in writing, to the justice, and requested him to enter it on his proceedings, which the justice declined to do:

" I, Jacob Specht, plead that I am a member, in full communion, of the Seventh Day Baptist Congregation, at Snowhill; and that I conscientiously believe, that the seventh day of the week is the true Sabbath of the Lord, and that I accordingly observe it as such."

The Court of Common Pleas affirmed the judgment of the justice; whereupon Jacob Specht, the defendant below and plaintiff in

error, sued out this writ.   The question here was: Is the 1st section of the act of the 22d of April, 1794, unconstitutional ?

*Stevens* and *Brady*, for plaintiff in error.—This record raises the question of the constitutionality of the act of 22d April, 1794.

At common law it was no offence to transact innocent business on Sunday.   It is made criminal by act of Assembly alone.   That act of Assembly, we contend, violates the 3d section of the 9th article of the constitution of Pennsylvania.

We are aware that more than thirty years ago, this question was decided against us by the Supreme Court of this state, by two judges, one of whom was just closing a long life of usefulness, and was then of great age.   The other was just entering upon his judicial career.   But questions of much less importance to the happiness of society, and the unalienable rights of man, have been, not unfrequently, reconsidered by this court. , An important principle of the law of evidence, which had stood the test of more than forty years, and of repeated deliberate decisions of this court, was lately reversed and totally changed in Post *v.* Avery, and subsequent cases, because it was believed to work injustice in questions of property.   The legislature, as in this case, had refused to alter the law as established in Steele *v.* The Phœnix Insurance Company; and the court, in the exercise of an undoubted right, corrected it themselves.   We are, therefore, bold to ask them to re-judge and correct the judgment of the Supreme Court in a question which deeply affects and grieves the consciences of inoffensive and pious men, eminent for honesty, peacefulness, and orderly conduct.

Does this act of Assembly "control or interfere with the rights of conscience ?"   It evidently treats the first day of the week as a *holy*, a *sacred* day ; and it prohibits labour on that day, not for the . purpose of giving rest to man, as a mere civil regulation, but because it *profanes* the Lord's day.

We have other holidays.   We have political Sabbaths, such as the 4th of July, and 22d of February.   We reverence them as days of great political events.   But we do not enforce their observance by legislation.  But the act in question compels all to observe Sunday as a sacred day.   To oblige men to refrain from labour out of regard to its holiness, is to "control" their religious observance, as much as if they were ordered to kneel before the altar, or the images of the Saints.. And to all those who conscientiously believe that it is not a holy day—that it is not the true Sabbath of the Lord, it is an "interference" with, and a constraint of their rights

of conscience. It is no answer to say that the day of rest should be uniform among all. If it were a mere civil regulation, there might be some reason in it ; but then it would be made a day of recreation—of relaxation ; and most probably those days would not come so frequently. The French, when they discarded its religious character, when they worshipped the Goddess of Reason, and provided only for the rest of the people, fixed the tenth day. But I suppose it requires no other argument than reading the several acts upon this subject, to prove that our legislation looks to enforcing the *religious* observance of the day. If the legislature can direct that religious observance, then there is no limit to their power over religious subjects. If they can direct the people to stay at home quietly, they can direct them to go to church, and if they can direct them to attend church, they can indicate the church to be attended. In short, if they have any power over religious subjects, they have all power. Such power would be a perfect union of church and state, so much abhorred by the people of this republic. It would inevitably lead to religious persecutions, and finally to civil and religious tyranny.

The doctrine that the " Christian religion is a part of the common law," is, I suppose, the foundation and justification of this act. That doctrine was promulgated in the worst times, and by the worst men of a government that avowedly united church and state ; in times when men were sent to the block or the stake on any frivolous charge of heresy. To deny transubstantiation or the supremacy of the Pope, was a capital offence under one reign ; and to admit them was a capital offence under another. Men were punished as blasphemers for denying the divinity of our Saviour, because the " *Christian* religion was a part of the common law." Men were executed in great numbers by the civil power for denying the *real presence*, because that was a part of the Christian religion—and the Christian religion was a part of the municipal law. When the Protestants gained the ascendancy, to *believe* in the real presence was contrary to the Christian religion, and therefore a violation of the law, and punished by the secular arm. For it is truly observed : " That no set of men were ever found willing to suffer martyrdom themselves for conscience' sake, who would not inflict it upon others the moment they obtained power."

As late as the nineteenth century, this pernicious doctrine led Lord Eldon to decide that Unitarians may be punished as blasphemers at common law, and not treated as Christians, notwithstanding

the repeal of the statute of 9 and 10 Will. 3: 3 Merivale, 353, Atty. Genl. v. Pearson.

How dangerous, therefore, is the apparently pious doctrine that the "Christian religion is a part of the common law!" If it be true, all who disbelieve that religion are habitual breakers of the law. The Jew, the Hindoo, the Pagan, are perpetual malefactors. They, of course, are beyond the protection of the law, or continually subject to punishment for conscience' sake. These consequences of the doctrine were very satisfactory to the English government, in its origin. They enabled the tyrants of the fifteenth and sixteenth centuries to find a convenient excuse for sending to the block any one who became obnoxious to them. If such tyrant were a Roman Catholic, the heresy of the reformation was sufficient. If he were a Protestant, adhering to the church of Rome was equally so. This lauded principle found ready advocates in such bloody tools of tyrants as Jeffries, Audley, and Rich.

What else was it but the doctrine "that the Christian religion was a part of the law," and to be enforced by the civil arm, that gave the Holy Inquisition such horrid force, and placed the civil and religious liberty, and the lives of nations of men, at the mercy of the bloodiest power that ever inflicted misery upon the human race, in the name of Demons or of Gods!

This convenient doctrine enabled Henry the Eighth to dispose of all whom he chose to call his enemies, whether they were learned and conscientious gentlemen, like Sir Thomas More, or were wives of whose beauty he was weary. His successor, after robbing all the Jews of the kingdom of all their wealth, either sent them to death or banished them from the empire. And he was right, if this principle be right, for they were always violating the law, and of course deserved punishment.

If this doctrine is to be the rule of action, where do you find its interpretation? Where are to be found adjudged decisions of what this law teaches, so that the people may escape the perils of its violation? Are they to be seen in the doings of the Council of Nice or the Diet of Augsburg? Are they in the bulls of Hildebrand or the writings of Luther? in the rigid doctrines of Calvin, or the more liberal opinions of Wesley? Does this part of the "common law" (adopted in Pennsylvania) command us to bow down before the image of the Virgin and the Saints; or, discarding all visible symbols, to worship the Unseen God? This doctrine must drive us for refuge to the infallible church of Rome, where

the decrees of the Pope are the unerring rule of this part of the " common law."

The constitution of almost every state in the Union contains a section securing liberty of conscience.

The constitution of the United States, as originally adopted, had no such provision.

But the first Congress that met under it, added the following amendment :—

"Art. 1. Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof."

This article is not as comprehensive as the one in the constitution of Pennsylvania.

It has already received a construction by both the Senate and House of Representatives of the United States, which has a strong bearing on the present question.

I think I may safely say, that the constitutions of the United States and of Pennsylvania are founded on no religion, but on purely civil considerations—on the unalienable rights of man; one of which is *that man shall not interfere with the rights of conscience.*

The constitution of South Carolina contains the following provision : " The free exercise and enjoyment of religious profession and worship, without discrimination or preference, shall hereafter be allowed within this state to all mankind : *Provided,* That liberty of conscience thereby declared, shall not be so construed as to excuse acts of licentiousness, or justify practices inconsistent with the peace and safety of the state."

This provision, qualified by the proviso, is not nearly as strong as ours.

The city councils of Charleston passed an ordinance prohibiting, under penalty, all worldly employment on the Lord's day—"to preserve peace and good order within the city"—thus proposing to bring it within the proviso. In 1836, a Jew sold goods on Sunday, and was prosecuted under this ordinance. Judge Rice, a very able and learned jurist, decided that the ordinance was unconstitutional and void. The opinion is elaborate and able, but has since been reversed, on the strength of the proviso, in an opinion more pious than able : Law Rep. for May, 1848, p. 7.

Virginia had previously declared a similar ordinance of Richmond void.

The Supreme Court of Ohio, in the 15th vol. of her reports by Griswold, p. 225—The City of Cincinnati *v.* Rice—declared a like

2 D 2

ordinance void, as against those "who conscientiously observe the seventh day of the week as the Sabbath."

The section in her bill of rights is an exact copy of ours.

So far then as the authority of the United States, and of other states goes, this act is unconstitutional. And it seems to me it would be a reproach to this state, if it were not declared so.

But suppose it were competent for the legislature to prohibit labour on the Sabbath, on account of its sacred character, it is certainly not competent for them to declare which day of the week *is the* Sabbath. That would be a palpable "interference with conscience." For I suppose it will be admitted that there is an honest diversity of opinion on that subject. My clients are firm believers in the holy character of that day, and they strictly keep it, as the record shows. But they believe that the Lord, who alone had the power to fix it, rested the *seventh* day, and sanctified it as His Sabbath. And that designating the *first* day of the week as the Lord's day was a mere human invention.

Is there not enough in sacred history to justify honest and intelligent men in holding such opinion, without being stigmatised as "capricious?" God having laboured six days, rested the seventh, and sanctified that day, as we are told in the history of creation. But I am not aware of any injunction to man to keep it holy, until God condescended to give laws to the Jews after their flight from Egypt.

One of the Ten Commandments, given from the smoking top of Mount Sinai, says:—

"Remember the Sabbath day to keep it holy; six days shalt thou labour and do all thy work; but the seventh day is the Sabbath of the Lord thy God. In it thou shalt not do any work."

Here the time in which man *shall* work, and in which he *shall* not, is fixed by Deity himself, in a manner too solemn to be forgotten or disregarded. It was pronounced with the voice of a loud trumpet, amidst the lightnings and the quakings of the Mount. And this day has been always kept by the Jews, from that time to the present; and by the early Christians, until the fourth century. (Vide Justin Martyr and Origen, *passim*.)

Our clients believe that part of the decalogue which commands them to work six days, to be as binding on them as that which directs them to rest the seventh. And it must be confessed, that so far as earthly interests are concerned, it is quite as important. Did the world generally hold that salutary belief, and act accord-

ingly, we should have less need of poor-houses, jails, and vagrant-laws.

But if conscience directs them to work six days, and forbids them to work the seventh; and if the act in question prohibits their working on the first day of the week, then such act "*gives a preference to other modes of worship.*" It allows some six full days to labour, and restrains others to five. This subtraction of one additional seventh of their time of labour, and consequently of their means of profit, operates as a penalty on their religious belief.

It will not do to say that they are not compelled by law to work *six* days; they believe themselves to be so commanded by the decalogue—and that the act cutting off one of those days runs counter to the eternal mandate.

The first day of the week came to be treated as *the* day of worship among Christians after the conversion of Constantine from Paganism. He had previously worshipped the god Apollo, whose sacred day was the first day of the week. When he abandoned Apollo for Christ, he retained some of the relics of Paganism. Among the rest was the holy day of his ancient God. By a formal decree, he directed his subjects who lived in towns and cities (he exempted country people from it on account of inconvenience), to worship God on the "*day of the Sun—die solis.*" Hence that day came to be called "Sunday." His decree may be found at length in the "*Corpus Juris Civilis*, Book 3. tit. 12," in these words:—

"Omnes Judices, Urbanæque plebes, et cunctarum artium officialis *venerabili die solis*, quiescant. Ruri sed tamen et cetera."

Our act of Assembly is but a copy and an enlargement of this decree of a bloody despot, who earned the glory of saintship by assisting at the council of Nice, and enforcing its decisions by his civil magistrates. (Eusebius, Bishop of Cesarea.)

"The 4th section of our act enjoins upon judges and magistrates to proceed and convict in a *summary* way, all persons who shall *profane* the Lord's day, as aforesaid; and if the forfeiture be not paid, to *commit the offender without bail or mainprize to the house of correction, to be kept at hard labour, on bread and water only.*"

Religious intolerance could not invent a more odious law; nor one more repugnant to our constitution, and more opposed to the noble and independent injunction of St. Paul:—"Let no man therefore judge you in meat and in drink, and in respect of an holy day, or of the new moon, *or of the Sabbath days.*"—Col. ii. 16, 17.

*Nill*, contrà, would not discuss the question as to the origin of the first day of the week, or of the seventh day, as a season of rest. As Sunday has been observed, from the commencement of the Christian era until now, by ninety-nine hundredths of those recognised as Christians, he would consider it as the right day, having been established by long usage.

The act of 22d of April, 1794, cannot be viewed as regulating religious exercises, or as interfering with the rights of conscience. It does not prevent any one from worshipping God as he chooses, or as his conscience dictates. It only punishes him, by a prescribed penalty, for following worldly employments on that day. As the legislature possess the power necessary for the government of a free state, can any rational doubt exist as to their power touching the matter in question? The act operates solely as a political regulation. Its existence extends only to secular affairs. It furnishes repose to the weary, and gives rest to those in bondage. To all, it affords opportunities for reading, study, and reflection. From the first settlement of the state, Sunday has been kept: Colonial Records, vol. 1, page 33, sec. 36. As a vast majority of the people rest on this day, will it be pretended that the legislature cannot protect them in so doing? Our laws in relation to acts which are *mala prohibita*, are designed to punish men for conduct deemed at variance with public policy. Fishing in numerous streams, indecent exposure of person, horse-racing, masquerading, &c., are on this account interdicted. The Hebrew legislator, in his command as to the Sabbath, had temporal as well as spiritual matters in view, or he would not have directed rest for irrational animals.

He would not inquire what conscience is: whether it is an innate principle, or merely the result of education. It is known to be different, in regard to the same thing, in different parts of the world, under dissimilar religious influences. If laws could be made to conform to all the religious caprices that frenzied fanaticism would suggest, there would not be days enough in the week to accommodate such conscientious scruples. Mohammedans would want Friday, another sect another day, &c., &c. ? The laws against bigamy would have to be declared unconstitutional, because of the consciences of those who would desire a plurality of wives. And the laws which punish the fornicator and adulterer, and the person who commits incest, would be in the same category, on account of the conscientious scruples of the Battle-Axe Christians. One class would say that the school-law, by making them pay for the education of the children of others, was unconstitutional, while another

would allege the same against the militia-law, because it exacts a small fine for the non-performance of militia duty. Such positions have already been assumed. Listen to them, and qualms of conscience will be powerful in nullifying laws. In this state, where Christianity is said to be the basis of our laws, there will be no day of rest: 11 S. & R. 406; 1 Penn. Rep. 13. Let there be no Sunday. Let it be known that the legislature cannot protect orderly persons in their rest and meditations, and soon we will see the cruel and rapacious uniting to oppress those over whom they have control. If the government cannot supervise the morals of the community, it must be impotent indeed!! But these men, whose tender consciences ask to have this act made void, settled here with the full knowledge of the law. Hence they have no just cause for complaint. The sect has, it is believed, had its rise since the settlement of the state. This court has already decided this question, and in South Carolina it was decided quite recently. Therefore, as the constitution is the same, the act of Assembly the same, and the circumstances of the country the same, that they were when former adjudications were had, no good reasons exist for a departure from them: and as this court holds that a law should not be declared unconstitutional without its provisions are manifestly so (2 W. & S. 277), it is hoped the judgment of the court below will be affirmed. As to the constitutionality of the law, he cited 1 S. & R. 34; 3 S. & R. 48; 17 S. & R. 160; 2 Penn. Rep. 417; and the Monthly Law Reporter, vol. 1, no. 1, page 7.

BELL, J.—The plaintiff in error stands convicted under the first section of the act of 22d April, 1794. It prohibits, *inter alia*, any person to "do or perform any worldly employment or business whatever on the Lord's day, commonly called Sunday, works of necessity or charity only excepted." It is said that as against those who conscientiously observe the seventh day of the week for the Sabbath, of whom the defendant is one, the statutory provision is in direct conflict with section 3d, article 9th, constitution of the commonwealth. It ordains, "All men have a natural and indefeasible right to worship Almighty God according to the dictates of their own conscience; no man can, of right, be compelled to attend, erect, or support any place of worship, or to maintain any ministry against his consent. No human authority can, in any case whatever, control or interfere with the rights of conscience; and no preference shall be given by law to any religious establishment or modes of worship."

The question thus raised is not presented to the court for the first time.    It was here made as long ago as the year 1817, in the case of the Commonwealth *v.* Wolf (3 S. & R. 48.); and, after argument, solemnly decided adversely to the position of the plaintiff in error.    Until now, so far as we know, the soundness of this determination has not only passed unquestioned, but is incidentally recognised by other cases.    Upon the maxim *stare decisis*, and looking only to the ordinary course of judicial administration, we might, perhaps, without impropriety, have declined to consider the question as an open one in Pennsylvania.    But, impressed with the importance of preserving and protecting the unrestrained liberty of conscience guarantied by the constitution of the United States, and of the several states of the confederacy, including our own, and desirous of retrieving any error which, by possibility, might have been committed in so grave an inquiry, we have given close attention to the ingenious argument addressed to us by the counsel of the plaintiff in error, who, it is understood, represents a portion of our citizens belonging to a respectable Christian sect, which claims and keeps the seventh day of the week as the true Sabbath. The conclusion at which we have arrived, after much reflection, is in consonance with that before announced by this court in the case just alluded to.

The constitution of this state secures freedom of conscience and equality of religious right.    No man, living under the protection of our institutions, can be coerced to profess any form of religious belief, or to practise any peculiar mode of worship, in preference to another.    In this respect, the Christian, the Jew, the Mohammedan, and the Pagan, are alike entitled to protection.    Nay, the Infidel, who madly rejects all belief in a Divine Essence, may safely do so, in reference to civil punishment, so long as he refrains from the wanton and malicious proclamation of his opinions with intent to outrage the moral and religious convictions of a community, the vast majority of whom are Christians.    But beyond this, conscientious doctrines and practices can claim no immunity from the operation of general laws made for the government and to promote the welfare of the whole people.    In the language of Chief Justice Gibson, the right of conscience, as understood under our organic law, "is simply a right to worship the Supreme Being according to the dictates of the heart; to adopt any creed or hold any opinion whatever, or to support any religion; and to do, or forbear to do, any act for conscience' sake, the doing or forbearing of which is not prejudicial to the public weal" (Common-

wealth *v.* Lesher, 17 S. & R. 160; enforced in Simons *v.* Gratz, 2 Penn. Rep. 416). Does the act of Assembly in question impinge upon this natural right or on the constitutional declaration which seeks to foster and protect it? It is insisted, this question must receive an affirmative response, because, as it is said, the statute treats the first day of the week as a holy and sacred day, and prohibits labour as a profanation of the Lord's day; and it is thus proved to be, not a mere civil regulation to give rest to man, but an attempt to exalt, by law, the religious belief of certain sects over that of others.

Though it may have been a motive with the law-makers to prohibit the profanation of a day regarded by them as sacred—and certainly there are expressions used in the statute that justify this conclusion—it is not perceived how this fact can vitally affect the question at issue. All agree that to the well-being of society, periods of rest are absolutely necessary. To be productive of the required advantage, these periods must recur at stated intervals, so that the mass of which the community is composed, may enjoy a respite from labour at the same time. They may be established by common consent, or, as is conceded, the legislative power of the state may, without impropriety, interfere to fix the time of their stated return and enforce obedience to the direction. When this happens, some one day must be selected, and it has been said the round of the week presents none which, being preferred, might not be regarded as favouring some one of the numerous religious sects into which mankind are divided. In a Christian community, where a very large majority of the people celebrate the first day of the week as their chosen period of rest from labour, it is not surprising that that day should have received the legislative sanction: and as it is also devoted to religious observances, we are prepared to estimate the reason why the statute should speak of it as the Lord's day, and denominate the infraction of its legalized rest, a profanation. Yet this does not change the character of the enactment. It is still, essentially, but a civil regulation made for the government of man as a member of society, and obedience to it may properly be enforced by penal sanctions. To say that one of the objects of the legislature was to assert the sanctity of the particular day selected, is to say nothing in proof of the unconstitutionality of the act, unless in this the religious conscience of others has been offended and their rights invaded.

But it is argued, with apparent conviction of its truth, that to compel men to refrain from labour, *solely* from regard to the

imputed holiness of a particular day, is, within the meaning of the constitution, to "control" the religious observance, and to "interfere" with and constrain the consciences of those who honestly disbelieve the asserted sanctity of the selected day. We cannot assent to this. So long as no attempt is made to force upon others the adoption of the belief entertained by the governing power, or to compel a practice in accordance with it, so long is conscience left in the enjoyment of its natural right of individual decision and independent religious action. There is nothing to prevent the unrestrained expression of an adverse belief—though perhaps, with less of imposing effect than power lends to opinion, nor any hindrance offered to the full enjoyment of it, at least, so far as the exercise of religious devotion is involved. The error of the plaintiff's position is that it confounds the reason of the prohibition with its actual effect, and thus mistakes the mere restraint of physical exertion for the fetters that clog the freedom of mind and conscience. But were this otherwise, the plaintiff's argument is inapplicable to the act of 1794. The conclusions drawn from some of its language are as inexpressive of its practical operation, as of the principal intent of its makers. The phraseology used may indicate a conviction of the holy character of the first day of the week, but as this simple expression of an abstract opinion, which all other men are at liberty to adopt or reject, carries with it no obligation beyond the influence attendant upon the expression itself, it cannot be said a primary object of the act was, authoritatively, to assert the supremacy of Sunday as of Divine appointment. Had such been the intent, irrespective of its statutory character as a day of rest from secular employment, its framers would not have stopped short with a bare interdiction of labour and worldly amusements. Following the example offered by older states and communities, they would have commanded the performance of religious rites, or at least, some express recognition of the day as the true Sabbath. Such a requisition, we agree with the plaintiff in error, would be a palpable interference with the rights of conscience. But nothing like this is exacted. On the contrary, every one is left at full liberty to shape his own convictions, and practically to assert them to the extent of a free exercise of his religious views. In this, as in other respects, the conscience of each is left uncontrolled by legal coercion, to pursue its own inquiries and to adopt its own conclusions. In this aspect of the statute there is, therefore, nothing in derogation of the constitutional inhibition.

Nor, so far as I can perceive, is it obnoxious to this accusation,

in any other particular. It intermeddles not with the natural and indefeasible right of all men to worship Almighty God according to the dictates of their own consciences; it compels none to attend, erect, or support any place of worship, or to maintain any ministry against his consent; it pretends not to control or to interfere with the rights of conscience, and it establishes no preference for any religious establishment or mode of worship. It treats no religious doctrine as paramount in the state; it enforces no unwilling attendance upon the celebration of Divine worship. It says not to the Jew or Sabbatarian, You shall desecrate the day you esteem as holy, and keep sacred to religion that *we* deem to be so. It enters upon no discussion of rival claims of the first and seventh days of the week, nor pretends to bind upon the conscience of any man any conclusion upon a subject which each must decide for himself. It intrudes not into the domestic circle to dictate when, where, or to what god its inmates shall address their orisons; nor does it presume to enter the synagogue of the Israelite, or the church of the Seventh-day Christians, to command or even persuade their attendance in the temples of those who especially approach the altar on Sunday. It does not, in the slightest degree, infringe upon the Sabbath of any sect, or curtail their freedom of worship. It detracts not one hour from any period of time they may feel bound to devote to this object, nor does it add a moment beyond what they may choose to employ. Its sole mission is to inculcate a temporary weekly cessation from labour, but it adds not to this requirement any religious obligation.

Nor can it be objected against the statute that it gives a preference to any religious establishment or mode of worship. It leaves all free alike in the exercise of their distinctive religious tenets, saying to none, What doest thou? As I have said, the selection of the day of rest is but a question of expediency, and if from the choice falling on the first day of the week, the Jew and the Seventh-day Christian suffer the inconvenience of two successive days of withdrawal from worldly affairs, it is an incidental worldly disadvantage, temporarily injurious, it may be, to them, but conferring no superior religious position upon those who worship upon the first day of the week. The law intends no preference. The command to abstain from labour is addressed to every citizen, irrespective of his religious belief, and if an inconvenience results to some, it is a consequence of the generality of the provision. But this affords no argument against the constitutionality of the law,

2 E

however strong the argument might be felt when addressed to the legislature as a reason for a modification of the statute.

The only remaining ground upon which the plaintiff in error attacks the validity of the statute, is found in the assumption that, in conscience, he is as fully bound to attend to his secular affairs upon the first six days of the week, as to cease from labour on the seventh. Were this so, the law which compels him to inaction upon one of the six, might well be regarded as an invasion of his conscientious convictions. But for this supposed article of his faith, his counsel refers us to no other warrant than that command of the decalogue which teaches, "Remember the Sabbath day to keep it holy; six days shalt thou labour and do all thy work, but the seventh day is the Sabbath of the Lord thy God; in it thou shall not do any work." But without other evidence than the mere suggestion of counsel, we cannot believe that the religious sect to which the plaintiff in error belongs, have so construed this commandment as to make it imperative on its members, literally, to labour on every day of the week other than the seventh. Such is not rationally its meaning, nor is it that assigned to the word by the ancient people to whom it was originally delivered by the Deity.

From the beginning even until now, it is regarded by them as intended to set apart a day of religious rest, but not as commanding six days of labour. Within six days the Israelite was directed to do all his work, in order that he might devote the seventh, uninterruptedly, to the service of God, but it was never imagined that he was under an imperative obligation to fill up each day of the other six with some worldly employment. In the Commonwealth v. Wolf, the court rightly repudiates such a notion, and in this it has been followed by other tribunals. Indeed, the meaning of the command is so obvious as scarcely to leave room for construction; and accordingly, so far as we are informed, the practice of all who profess to believe in the Old and New Testaments, has been in consonance with the original interpretation.

Beside the adjudications already referred to, the determination to which we have attained is fortified by the recent decision of the Court of Errors of South Carolina, in the case of the City Council of Charleston v. Benjamin, decided in January, 1848, and is not impeached by The City of Cincinnati v. Rice, 15 Ohio Rep. 225, cited for the plaintiff in error. · This last case was determined upon the *proviso* of their statute, that nothing contained therein shall be construed to extend to those who, conscientiously, observe the seventh day of the week as the Sabbath. Did our statute offer a

similar provision, this controversy would, probably, never have arisen.

Judgment affirmed.

His honour, Judge COULTER, concurred in the judgment of the court, as to the constitutionality of the act of Assembly, but dissented from the grounds assumed in the argument. He held it to be constitutional, because it guarded the Christian Sabbath from profanation, and, in the language of the act, prohibited work or worldly employment on the *Lord's Day*, commonly called *Sunday ;* and not because of the mere usefulness of the day as a day of rest and cessation from worldly labour.