Bertera's Hopewell Foodland, Inc., Appellant, *v.* Masters.

Argued September 27, 1967. Before Bell, C. J., Musmanno, Jones, Cohen, Eagen, O'Brien and Roberts, JJ.

*Hubert I. Teitelbaum,* with him *Martin M. Sheinman, John Allan Conte,* and *Morris, Safier & Teitelbaum,* and *Conte & Courtney,* for appellant.

*Robert J. Masters,* District Attorney, for appellees.

Opinion by Mr. Justice Musmanno, November 28, 1967:

The plaintiff, Bertera's Hopewell Foodland, Inc., owns a supermarket in Hopewell Township, Beaver County, which, at the beginning of this litigation, employed 60 persons, 40 of whom worked in the establishment on Sundays. The District Attorney of Beaver County, Robert J. Masters, informed Bertera's Food-

land that if it continued to operate on Sunday, he would prosecute under the "Sunday Closing Laws" of June 24, 1939, P. L. 872, §699.15, amended September 27, 1961, P. L. 1695, §1, 18 P.S. §4699.15, which prohibits, with certain exceptions, the sale on Sunday of meat, produce and groceries.

The plaintiff refused to cease Sunday operation, claiming that the Amendment of 1961, above cited, was unconstitutional in that it violated the 14th Amendment to the Constitution of the United States and Article III, §7 of the Pennsylvania Constitution, averring it to be vague, indefinite, failed in equal protection and was not based on real and substantial differences which are reasonably related to the purpose of the law. The plaintiff went into the Court of Common Pleas of Beaver County to seek an injunction restraining the district attorney and other law prosecuting officers in the county, from enforcing the statute in question.

The lower court held that the statute was constitutional, the injunction was denied and the complaint dismissed. The plaintiff appealed.

We are satisfied that equity has jurisdiction. (*Adams v. New Kensington,* 357 Pa. 557; *Harris-Walsh, Inc. v. Dickson City Boro.,* 420 Pa. 259.)

The Act of September 27, 1961, P. L. 1695, provides that: "Whoever engages in the business of selling or otherwise dealing at retail in fresh meats, produce and groceries on Sunday shall, upon conviction thereof in a summary proceeding for the first offense, be sentenced to pay a fine of not exceeding one hundred dollars ($100), and for the second or any subsequent offense committed within one (1) year after conviction for the first offense, be sentenced to pay a fine of not exceeding two hundred dollars ($200) or undergo imprisonment not exceeding (30) days in default thereof."

This Act is one of the many postscripts to the original Pennsylvania Sunday Closing Law enacted in the earliest days of the Commonwealth, that is, the Act of April 22, 1794, 3 Sm L. 177, and which merged into the now parent act of June 24, 1939, P. L. 872. From time to time the original Act of 1794 has been amended to allow wholesome entertainment and recreation on Sunday.[1] Its original strict provisions were also relaxed so as to permit the operation of certain businesses reasonably necessary for the comfort and convenience of the people, without detracting from the nature of Sunday, which was, and still remains, dedicated to the three R's: Religion, Rest and Recreation.

Obviously there could not be much rest or recreation for a person on Sunday if he could not obtain food on that day. While, of course, everybody should foresee on Saturday that he would need to eat on Sunday, and therefore should lay in a supply of provisions for the morrow, yet circumstances could prevent a realization of that anticipation and one should not be subjected to the hardship of fasting when, without any defilement of the pure Sabbath atmosphere, he could still obtain the required provender to sustain him over the weekend. Accordingly, the Legislature, in the Act of 1961, declared that: "This section shall not apply to any retail establishment employing less than ten persons or to any retail establishment where fresh meats, produce and groceries are offered or sold by the proprietor or members of his immediate family or employing less than ten persons nor shall it apply to any retail establishment where food is prepared on the premises for human consumption."

We thus have three exceptions to the application of the Act, which, for convenience in discussion, we will

---

[1] The writer of this opinion spearheaded in the 1939 General Assembly the legislative campaign which resulted in the legalization of professional Sunday baseball and motion pictures.

number (1) where the store employs no more than 9 persons; (2) where the store is owned and run by a person and members of his immediate family (or employs no more than 9 persons); (3) where the establishment prepares food on its premises for eating purposes.

The plaintiff argues at length that a statute so vague that men of common intelligence must guess at its meaning violates due process. It wheels into play a battery of decisions to support this position—all so unnecessarily. Obviously, if a statute is printed in Chinese or is proclaimed in such badly expressed English that one cannot learn from it what is permitted and what is prohibited, it cannot be enforced. Instead of emphasizing the obvious, the plaintiff should show wherein the statute is vague. It attempts to do this by aiming its artillery of argumentation against the three exceptions in the Act, but its aiming is faulty because it does not set its sights in accordance with the criteria laid down in the Statutory Construction Act (May 28, 1937, P. L. 1019, §51, 46 P.S. §551), which declares that in interpreting a law one must take into consideration, inter alia, "(1) the occasion and necessity for the law; (2) the circumstances under which it was enacted; (3) the mischief to be remedied; (4) the object to be attained; (5) the former law, if any, including other laws upon the same or similar subjects; (6) the consequences of a particular interpretation, (7) the contemporaneous legislative history . . ."

The plaintiff in its analysis and interpretation of the law of 1961 does not discuss the "occasion and necessity for the law", it says nothing about "the object to be attained," it wholly ignores the "former law" and those "other laws upon the same or similar subjects." The plaintiff treats the law of 1961 as an entity wholly isolated from any other legislation,

but the enactment of 1961, to begin with, is but an amendment to another law. It is a branch grafted to the original tree, and who can determine the nature of the resulting fruit without studying the trunk and the roots of the original plant? The Act of 1961, as already stated, is an amendment of the Act of 1939, which is but a descendant of the original Act of 1794, which declared that: "If any person shall do or perform any worldly employment or business whatsoever on the Lord's day, commonly called Sunday, works of necessity and charity only excepted, or shall use or practice any unlawful game, hunting, shooting, sport, or diversion whatsoever, on the same day, and be convicted thereof, every such person, so offending, shall, for every such offence, forfeit and pay four dollars, to be levied by distress; or in case he or she shall refuse or neglect to pay the said sum, or goods and chattels cannot be found, whereof to levy the same by distress, he or she shall suffer six days imprisonment in the house of correction of the proper county: Provided, always, that nothing herein contained shall be construed to prohibit the dressing of victuals in private families, bake-houses, lodging-houses, inns, and other houses of entertainment, for the use of sojourners, travellers, or strangers, or to hinder watermen from landing their passengers, or ferrymen from carrying over the water travellers, or persons removing with their families, on the Lord's day, commonly called Sunday, nor to the delivery of milk, or the necessaries of life, before nine of the clock in the forenoon, nor after five of the clock in the afternoon, of the same day."

This Act of 1794 itself traces an ancestry back to the Ten Commandments fulminated from the smoking top of Mt. Sinai, proclaiming in the Eighth, Ninth and Tenth provisions thereof: "Remember the sabbath day to keep it holy. Six days shalt thou labor and do all thy

work: But the seventh day is the sabbath of the Lord thy God: in it thou shalt not do any work."

This divine pronouncement became part of the Common Law inherited by the thirteen American colonies and by the sovereign States of the American union. William Blackstone, in his immortal Commentaries, declared: "the keeping one day in the seven holy, as a time of relaxation and refreshment as well as for public worship, is of admirable service to a state, considered merely as a civil institution. It humanizes by the help of conversation and society, the manners of the lower classes, which would otherwise degenerate into a sordid ferocity and savage selfishness of spirit; it enables the industrious workman to pursue his occupation in the ensuing week with health and cheerfulness; it imprints on the minds of the people that sense of their duty to God so necessary to make them good citizens, but which yet would be worn out and defaced by an unremitted continuance of labor, without any stated times of recalling them to the worship of their Maker." (4 Bl. Comm. 63)

Before William Penn left England for the sylvania, of which he was proprietor, he and his fellow-Quakers adopted on May 5, 1682, a code of laws, the 36th of which reads: "That according to the good example of primitive Christians, and for the ease of creation, every first day of the week, called Sunday, people shall abstain from their common daily labor, that they may better dispose themselves to worship God according to their understanding."

The first law enacted by the Quakers, (December 7, 1682) after forming a government which was to become the Commonwealth of Pennsylvania, declared that "people shall abstain from their usual and common toil and labor" on Sunday. The law, in varying language, was reenacted in 1705, 1779, and 1786. Then, when the ink on the Constitution of the United States had

but recently dried, the General Assembly on April 22, 1794 enacted the parent Sunday law which still controls in Pennsylvania.

From time to time, as already indicated, there have been modifications of the Act of 1794, in order to allow the people of Pennsylvania increased opportunity for revitalizing their spiritual and physical forces, but the Legislature has never deviated from the principle that Sunday is a day dedicated to religion, rest and recreation, and that its sanctified atmosphere must not be defiled through crass commercialization. The objectives of the Act of 1794 were to secure: "the observance of a day of rest for the community, thereby enabling every one to worship according to the dictates of his conscience, without distraction, and without disturbance, and thus giving a check to vice and immorality." (*Sparhawk v. Union Passenger Ry. Co.,* 54 Pa. 401, 409.)

Leaving aside for the moment the right to rest on Sunday, which is indisputable, setting apart for the moment the right to recreation, which is equally not to be questioned, the right of a citizen of the Commonwealth to be free of distracting noises, and commotion arising from industrial and commercial pursuits, which could disturb his worshipping, is protected by the law of 1794 and all its amendments. As churchgoers have the right to be saved from the firing of cannon or the beating of drums outside their houses of worship on Sunday, so also are householders protected under the laws of the Commonwealth from turbulences generated by excessive population movement attendant on business enterprises not falling within the exceptions listed in the Sunday Closing Laws. All the legislation on this subject departs from the premise that Sunday is a day different from the other days. The plaintiff nowhere in its argument seems to recognize this basic

fact, without which debate on the law of 1961 is only empty sound.

Justice WOODWARD in the case of *Johnston v. Com.,* 22 Pa. 102, illuminated the subject with juridical eloquence when he said: "It would be a small boon to the people of Pennsylvania to declare their indefeasible right to worship God according to the dictates of their conscience, amid the din and confusion of secular employments and with desecrations on every hand of what they conscientiously believe to be hallowed time. These statutes were not designed to compel men to go to church, or to worship God in any manner inconsistent with personal preferences, but to compel a cessation of those employments which are calculated to interfere with the rights of those who chose to assemble for public worship. The day was set apart for a purpose, and the penal enactments guard it, but they leave every man free to use it for the purpose or not. If he wish to use it for the purpose designed, the law protects him from the annoyance of others—if he do not, it restrains him from annoying those who do so use it."

There is no merit to the contention that Sunday closing laws impinge on the First Amendment to the U. S. Constitution which prohibits the "establishment of religion," because, inseparably associated with that proscription, there is the mandate that there shall be no prohibition of "the free exercise" of religion. The founders of our government and the drafters of our laws always held high in their minds and close to their hearts the sanctity of the Sabbath as they enacted legislation with reference thereto. Thus, it would be a violation of the First Amendment to compel people, who accept Sunday as a religious day, to work on that day.

The laws of America are not arbitrary, mathematical pronouncements devoid of policy, program or phi-

losophy. America is a religious nation.[2] Of course, it is fundamental that no religious belief can be made a condition for holding public office and everyone is free to live and act without religious avowals of any kind. Nevertheless, our whole structure of government is founded, and it operates, upon the principle of a belief in a Supreme Being. Our legislative bodies and our courts bespeak religious reverence and call upon the Author of the universe for guidance and upholding of the truth, our Chief Executive proclaims days of prayer, and every monetary unit carries the legend "In God We Trust."

Universal recognition of the Deity in the affairs of men finds its most forceful expression on the Sabbath, not only because of church services on Sunday, but also because that day is dedicated to the reunion of families, the manifestation of filial and parental affection, the fraternization among neighbors, and the general disposition toward acts of charity and benevolence. Say what one will, man is more disposed to do good on Sunday than he is throughout the week. Less crimes are committed on the Sabbath Day than on week days. The whole body of the people seems to recognize on Sunday a general truce in the commercial, industrial and professional arena which might be regarded quite extraordinary during the week. Justice HARLAN of the Supreme Court of the United States in the case of *Hennington v. Georgia,* 163 U.S. 299, quoted with approval from Justice FIELD who, while discussing a statute of California relating to the Sabbath day, said: "Its requirement is a cessation from labor. In its enactment, the Legislature has given the sanction of law to a rule of conduct, which the entire civilized world recognizes as essential to the physical and moral well-being

---

[2] Justice DOUGLAS of the Supreme Court of the United States said, in the case of *Zorach v. Clauson* (343 U.S. 306 (1952)) : "We are a religious people."

of society. Upon no subject is there such a concurrence of opinion, among philosophers, moralists and statesmen of all nations, as on the necessity of periodical cessations from labor. One day in seven is the rule, founded in experience, and sustained by science . . . The prohibition of secular business on Sunday is advocated on the ground that by it the general welfare is advanced, labor protected, and the moral and physical well-being of society promoted." (*Ex Parte Newman*, 9 Cal. 502.)

No one recognizes and appreciates these truths more than the working people of America. They have struggled long and arduously to achieve a just measure of recompense for their labors and an appropriate period of time for rest and recuperation and for intimate companionship with their families. These desiderata are now written into the fabric of our laws and have become as much a part of the public policy of the nation as the principles enunciated in the Declaration of Independence. Breaches in that policy, without an imperative necessity stemming from reasons of health, security and general welfare, must not be permitted under artificial reasoning such as that advanced by the plaintiff in this lawsuit.

To allow the plaintiff to do what it contends for here, would be to make Sunday no different from Tuesday or Thursday because if the plaintiff can operate with 40 employees on Sunday, a larger establishment can operate with 400, all of whom would be taken from their families and all of whom would thus be deprived of the reverential, inspirational and recreational benefits inherent in the Sabbath Day. Chief Justice WARREN aptly said in the case of *McGowan v. Maryland,* 366 U.S. 420, 444. "Numerous laws affecting public health, safety factors in industry, laws affecting hours and conditions of labor of women and children, weekend diversion at parks and beaches, and cultural activi-

ties of various kinds, now point the way toward the good life for all. Sunday Closing Laws, like those before us, have become part and parcel of this great governmental concern wholly apart from their original purposes or connotations."

Sunday Closing Laws contribute to the building of character because the rest and relaxation of the Sabbath are enjoyed in the general atmosphere of a Divinity which guides destiny, invites introspection and retrospection, and invokes a deeper appraisal of what one owes to his fellow man and to society. It is a truism, which can be attested to by anyone who has experienced the contrast, that the repose of Sunday is more restful and salubrious to him than inactivity on a weekday. The absence of work on a weekday means merely the shutting down of the human machine for a day, but the leisure of a Sunday carries with it the spirituality which has been gained through centuries of dedication to spirituality.

It is another truism that a day of rest is more meaningful, more rehabilitating and more conducive to elevated thoughts when it is enjoyed with others, than when it is spent alone, while the remainder of society fends and fights in the mundane antagonisms of a weekday. Justice BELL well said, in the case of *Specht v. Commonwealth*, 8 Pa. 312, that "all agree that to the well-being of society, periods of rest are absolutely necessary." He then cogently added that "to be productive of the required advantage, these periods must recur at stated intervals, so that the mass of which the community is composed, may enjoy a respite from labor at the same time."

In *McGowan v. Maryland*, 366 U.S. 420, 450, Chief Justice WARREN said: "The State's purpose is not merely to provide a one-day-in-seven work stoppage. In addition to this, the State seeks to set one day apart from all others as a day of rest, repose, recreation

and tranquility—a day which all members of the family and community have the opportunity to spend and enjoy together, a day on which there exists relative quiet and disassociation from the everyday intensity of commercial activities, a day on which people may visit friends and relatives who are not available during working days."

The law of 1961 here in controversy reaffirms the principles enunciated in the Act of 1794 by outlining punishments for those who engage in the business of selling or dealing at retail in certain products on Sunday. Therefore, the Act of 1961 must be read in the light of the torch whose solemn incandescence has never dimmed since it was ignited in 1794.

But the plaintiff in the case at bar sees only one tiny spark peripherally shooting off from that torch and apparently believes it may snuff out the entire torch if it can smother that one spark. And so, the plaintiff minutely studies and dissects individual words in the Act of 1961, closing its eyes to the whole structure of language built up on the subject of Sunday Closing Laws, and which must be considered when one, as one must, under the Statutory Construction Law, consider "the occasion and necessity for the law."

The statute of 1961, like any document, must be read in the climate and atmosphere which saw it come into existence. A statute cannot be dissected into individual words, each one being thrown on to the anvil of dialectics to be hammered into a meaning which has no association with the words from which it has violently been separated.

The plaintiff declares that the statute of 1961 is unconstitutional for vagueness because it "does not inform us as to whether less than ten working only on Sunday invokes the exemption or whether it applies only to those having a total of less than ten employees even if they do not all work on Sunday."

A reading of Exception No. 1 clearly demonstrates that it applies only to such establishments that employ less than 10 persons at *any* time. The purpose of Exception No. 1 is to allow small stores to operate for necessitous purposes. It is common knowledge that, despite the ever-swelling dimensions of modern metropolises, a high percentage of the Commonwealth's population still lives in small towns or semi-rural communities, where restaurants and hotels are not as plentiful as lamp posts. In the absence of those modern dining facilities, the non-urban people turn to what has, for the last century or two, been the all-provider, as a hen with her chicks, for the village, hamlet, and town, namely, the corner grocery store. Thus, the General Assembly legislated into permanent Sunday existence this purely American institution. To prevent, however, that the little shop should take on a size and shape which would turn it into something more than the proverbial corner grocery store, the Legislature placed a limit of 9 persons on the number who could be employed in the store.

An establishment which employs a hundred persons during the week may not operate on Sunday, even if it calls out to work on that day only 9 persons. With the phenomenal development of automation it is possible to conceive of a supermarket employing 100 persons during the week, which could, with the use of these 100 employees, install devices which could be operated by 9 persons on Sundays. Such an operation could cater to large crowds, building up mass movement and traffic conditions leading to the crass commercialization of the Sabbath which the laws of Pennsylvania, down through the centuries, have consistently determined to prohibit.

The language of Exception No. 1 is not vague. It says that the Act shall not apply "to any retail establishment employing less than ten persons." It does not

say any *Sunday* establishment. It says *establishment,*
period.

The plaintiff asks what would happen if the pro-
prietor of a store prepared potato salad, cole slaw and
hot dogs and at the same time sold fresh meats, pro-
duce and groceries in such volume that he employed
1,000 persons? The answer is that he would be ar-
rested if he did this on Sunday, because he would fall
under the provisions of Exception No. 1 which says
that the sale of fresh meats, produce and groceries
must be accomplished by not more than 9 persons.
The preparation of potato salad, cole slaw and hot dogs
comes under Exception No. 3, which will be discussed
later.

The plaintiff asks why should there be a distinction
between a grocery store which employs 9 persons and
one which employs 10 persons? The answer is that a
line must be drawn somewhere. Why is a young man
under 21 exempt from contractual obligations involv-
ing non-necessaries and one who is 22 not so exempt?
If the line were not drawn at 21, where would the next
stop be? At 30, 40, 55?

Exception No. 2 is a humanitarian one. There are
many small family-owned grocery stores from which
a family derives its livelihood. It would be unjust to
shut down this type of a store, while allowing the op-
eration of marts which employ 9 persons. Since mem-
bers of an immediate family do not, except in rare
instances, go into an excessively numerous figure, there
is no danger that a corner grocery store could swell
into a mammoth supermarket manned by polygamists
boasting hundreds of children.

The plaintiff asks, What is an immediate family?
The New Random House Dictionary (published in
1966) defines family (this being the first definition in
the list of meanings) as "Parents and their children,
whether dwelling together or not." Of course, we know

that the word "family," in itself, is capable of a far more extensive scope. It can include aunts, uncles, nephews, nieces, cousins, and so on, but it is clear that the exception clause in the statute under consideration was not intended to embrace the whole span of consanguineal and in-law relatives. The statute restricts the word "family" to "immediate family." This restricts the phrase to lineal relatives and excludes collateral relatives. In *Miller v. Preitz,* 422 Pa. 383, 390, this Court, under special circumstances not here present, said that the word "family" may include nephews but it pointed out that the language there being interpreted "was not intended to be unduly restrictive." Here the language *is* intended to be unduly restrictive. It says "immediate family" and *that,* considering the obvious intention of the Legislature, can only mean husband, wife and children. To have the exception go beyond that circle of relatives would make meaningless the whole intent of the exception, namely, to restrict Sunday operations to small stores. If "immediate family" were to be interpreted to include uncles, aunts, nephews, brothers, sisters, cousins, grandchildren, the whole purpose of the exception would be lost because such an expansion of the family could fill an Ark.

The second part of Exception No. 2 might seem to be troublesome, if taken literally. Exception 2 says that the penal provisions of the Act shall not apply to a store where the enumerated commodities "are offered or sold by the proprietor or members of his immediate family OR employing less than ten persons." (Emphasis supplied.) Here, we must have recourse to the Statutory Construction Act which says that the intent of the Legislature is paramount and that, in determining that intent, the Court must be guided by the presumption "that the Legislature does not intend a result that is absurd, impossible of execution or unreasonable." (Statutory Construction Act, supra: §52, 46

P.S. §552). The word "or" in Exception No. 2 was plainly intended to be conjunctive rather than disjunctive. This sometimes happens and such an interpretation received the imprimatur of this Court long ago. In *Rolland v. Commonwealth*, 82 Pa. 306, 326, Justice PAXSON said: "We are therefore led to the conclusion that the word 'or' in the 135th section should be read 'and', which would make the offense that of burglary at common law. Such a mode of construing a statute is not without precedent. It was done by this Court in Murray v. Keyes, 11 Casey 334; Bollin v. Shiner, 2 Jones 205; Foster v. Com., 8 W. & S. 77."

In *United States v. Fisk*, 3 Wall. 445, the Supreme Court of the United States said: "In the construction of statutes, it is the duty of the court to ascertain the clear intention of the legislature. In order to do this, courts are often compelled to construe 'or' as meaning 'and' and again 'and' as meaning 'or' ".

As late as 1966, we approved of this interpretation in the case of *Petrash Guardianship*, 425 Pa. 433.

What was the intention of the Legislature in Exception 2? It was to allow family-owned stores to operate, because, in any case, the number of persons in an immediate family could not be large. At the same time, the Legislature could not intend to deny to the family-operated store a privilege assured the non-family operated stores. Thus, even a small family-owned store might need help to operate it, and so, the Legislature said it could employ less than 10 persons. Accordingly, Exception 2 is to read that the penal provisions of the Act shall not apply "to any retail establishment where fresh meats, produce and groceries are offered or sold by the proprietor or members of his immediate family [*and*] employing less than ten persons." To read the bridge between the two parts of the exception in the disjunctive would make the second part of Exception No. 2 blatantly redundant

because Exception No. 1 already limits the employees by retail establishments to a crew of less than 10 persons.

Why did the Legislature add, after excepting family-owned stores, the right for the family to employ personnel up to the number of 9? Although the Act is a short one, it is as full of meaning as a coconut is with milk. Let us suppose a family-owned store where the immediate family consists of only the husband, wife and one child. Not to allow this type of an owned store to employ help would be to discriminate against it, since, any other grocery store, under Exception No. 1, may hire up to 9 persons. Hence, the addition of the clause that the family-owned store may employ up to 9 persons.

The plaintiff argues that it is a family-held corporation and thus should be exempt under Exception No. 2. This reasoning is fallacious because Exception No. 2 necessarily encompasses the concept of a family operating the store, "offering and selling" commodities. This would exclude a corporation, which is a fictitious being, a mere creation of the law, even though the stock of the corporation might be held by only one family. The corporation cannot physically stand in the store to "offer and sell".

Exception No. 3 is intended to exclude from the law's operation such establishments where the food is prepared on the premises for human consumption. This exemption could particularly apply to delicatessen stores where salads, sandwiches, puddings, baked beans, stewed vegetables, pastries, fruits and so on, are prepared for human consumption, that is, food which requires no further preparation before being consigned to the grinding molars, the taste glands and the gastric juices of the hungry consumer.

Whether the food is actually consumed on the premises is immaterial, but it must be ready for consump-

tion when the customer purchases it. In addition, the vendor, in order to obtain the benefit of Exception No. 3, must prepare, on his premises, the food he sells. The record does not indicate that the plaintiff prepares his commodities on the premises. The plaintiff speaks of "slicing, cutting, dressing, trimming, cleaning and packaging", but this is not preparation in the sense of the statute. Preparation must embrace more than cutting a large piece of meat into smaller pieces, it means more than taking an item out of a large package and selling it in a smaller package. If the plaintiff's stock in trade consisted only of what is prepared elsewhere, the exception would devour the prohibition. To exempt everything from a law is to include nothing. It would be like saying that horseback riding is prohibited in a certain park except to horsemen, or to say that the roasting of popcorn is prohibited unless the popcorn pops.

"To prepare" means to make ready. In relation to food, *to prepare* means, according to Webster's Dictionary, "to get ready for eating by due assembling, dressing or cooking." Taking cans of preserved tomatoes out of a large wooden case and selling the cans separately would not be "assembling, dressing or cooking."

The wizardry of science, the ingenuity of chefs, and the resourcefulness of food mechanics may soon reach the point, if it has not already indeed passed that stage of culinary magic, where a whole meal, from the proverbial soup to the proverbial nuts, may be sealed into a single can, so that all the Park Avenue hostess would need, in order to serve in a grand style, would be a can opener and a lorgnette.

The preparation referred to in Exception No. 3 inevitably includes cooking, but it is not limited to cooking because such exclusion would reduce the nation to a minor disaster area, since sandwiches to Americans

are what rice is to the Chinese, liverwurst to the Germans, pasta to the Italians, smorgasbord to the Scandinavians, and blubber to the Eskimos.

The plaintiff takes the verb "prepare" and tries to stretch it to include every possible stage of preliminary work which goes into the final product it sells over the counter. Lassoing a steer is part of the preparation of selling beef. Transporting the steer is another part of the preliminary work which leads to the eventual sale of porterhouse steaks. Slaughtering it, skinning it, and quartering it are all part of the preparation, but no one in the full possession of the four quarters of his brain would argue that under the statute of 1961, someone could operate a ranch, a railroad, a slaughterhouse and a grocery store, all on the basis that every stage of the journey from the prairies to the delicatessen counter is part of the preparation of a roast beef sandwich.

As already stated, the plaintiff attempts to analyze the Act of 1961, as if it were a wholly disassociated act of the Legislature and as if it had nothing to do with the Sunday Closing Laws. This is like trying to descend from the 10th floor of a building to the 1st floor in one jump. It cannot be done without disaster. One cannot read the Act of 1961 without having before him the Act of 1794, one cannot analyze the Act of 1961 without keeping in mind at all times the purpose of the Act of 1794 and Sunday Closing Laws in general. The argument advanced by the plaintiff, if accepted, would completely destroy the intent and purpose of Sunday Closing Laws, which have become an integral part of the American way of life. The American workingman is entitled to a day of rest with his family. While it is obvious that, because of works of necessity, charity, and recreation, some persons will be required to toil on Sunday, the number so engaged must be kept at a minimum. That is the keystone of

the Sunday Closing Laws as they span nearly three centuries of American life.

Thus, the law looks with a wary eye on any loosening of that keystone. Every decision of the Pennsylvania Courts indicates that Sunday Closing Laws are to be interpreted in order to avoid a weekday commercialization of the Sabbath that would lessen reverence for the holy day, as proclaimed in the original Act of the General Assembly, the succeeding relevant Acts, and all the decisions interpreting those Acts. If one supermarket may employ 40 persons under a loose reading of the law of 1961, then a super-supermarket may employ 600, a super-super-supermarket may employ 6,000 until Sunday may become a day of paganism in violation of the intention of the founders of our nation, the architects of the Commonwealth of Pennsylvania, and the expression of all the jurists treating this subject.

In its brief the plaintiff has asked many questions, as already indicated, seeking to demonstrate that the statute of 1961 is vague and constitutes special legislation. Most of the questions have been far-fetched. For instance, the plaintiff has asked if a store may legally employ 100 persons if the proprietor is present at the sales. The answer to that is found in Exception No. 2 which explicitly states that no family-owned store may employ more than 9 persons.

The plaintiff argues, in support of its thesis of vagueness, that if the interpretation of the three exceptions is to limit, in any event, the employment of persons to 9 persons, there would be no need for Exceptions 2 and 3 because Exception 1 already places the limit on employees at 9. But that is not the interpretation nor the language of the Act. Exception No. 1 restricts the grocery store to the employment of 9 persons. Exception No. 2 restricts operation of the store to immediate family members and a hired force

of not more than 9. Exception No. 3 makes no restriction on the number that may be employed, but specifically declares that the food for sale must be prepared on the premises for human consumption, and the obvious inference, as already indicated, is that the food is to be eaten reasonably soon and not stored. The simplest illustration of what Exception No. 3 aims at is, of course, the delicatessen store.

The plaintiff argues that the statute is unconstitutional by characterizing it as "special legislation," citing in this respect *Chalmers v. City of Philadelphia,* 250 Pa. 251. In that case the Supreme Court declared unconstitutional a law which provided that an engineer operating a steam boiler or engine over 10 horsepower was required to have a license, whereas those operating an engine under 10 horsepower did not have to have such a license. The difference between that situation and the one at bar is obvious. A steam boiler or engine is intrinsically a hazardous instrumentality and could inflict harm whether its horsepower measured 5 or 50. But the classification of less than 10 persons in the statute of 1961 has nothing to do with mechanical hazard. The problem presented here is that of size, and size of itself is a proper criterion for classification. (*Durkin v. Kingston Coal Co.,* 171 Pa. 193).[3]

Certainly a statute which prohibits the entrance of animals into an establishment could make an exception for dogs, but it could not be maintained successfully, in opposition, that because an exception is made for dogs, it would be "special legislation" to exclude elephants. A small store may present no difficulties in mass movement but a large store employing hundreds

---

[3] "The definition found in the act of 1891 seems to us reasonable, to be within the fair limits of a legislative definition, and to exclude only such operations as are too small to make the general regulations provided by the act applicable to them."

of clerks and catering to thousands of customers could produce traffic congestion, unbearable noises and a general condition wholly violative of the intent and purpose of the Sunday Closing Laws. The Supreme Court of the United States said in the case of *Two Guys v. McGinley*, 366 U.S. 582: "It was within the power of the legislature to have concluded that these businesses were particularly disrupting the intended atmosphere of the day because of the great volume of motor traffic attracted, the danger of their competitors also opening on Sunday and their large number of employees. 'Evils in the same field may be of different dimensions and proportions, requiring different remedies . . . . Or the reform may take one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind . . . . *The legislature may select one phase of one field and apply a remedy there, neglecting the others.*' " (Emphasis supplied.)

This recognition by the Supreme Court of the United States of the right of the legislature to legislate in one field to the exclusion of other fields should be the answer to the rather frivolous objection that to exempt the grocery store from the prohibitions of the Act of 1961 would be to introduce "economic discrimination" against the large stores. This is like the horse in the fable that said to the rooster that it was only fair that if the rooster tramped on the horse's feet the horse had the right to tramp on the rooster. How can the small grocery store possibly hurt the giant supermarket by tramping on its mastodonic feet?

The exception of the corner grocery store from the operation of the Act of 1939 is the same kind of exception which was made in the parent Act of 1794 for "private families, bake-houses, lodging-houses, inns, and other houses of entertainment" and for ferrymen "carrying over the water travellers, or persons removing with their families, on the Lord's Day."

We affirm the decision of the lower court that the Act of 1961 is constitutional. We wish, however, to correct an erroneous interpretation on the subject of penalties for violation of the Act of 1961. The Act provides that whoever violates the Act shall "upon conviction thereof in a summary proceeding for the first offense, be sentenced to pay a fine of not exceeding one hundred dollars ($100), and for the second or any subsequent offense committed within one (1) year after conviction for the first offense, be sentenced to pay a fine of not exceeding two hundred dollars ($200) or undergo imprisonment not exceeding thirty (30) days in default thereof."

The lower court stated that if an offender repeats his offense after a lapse of one year following his first offense he shall be treated as a first offender. This could be an invitation to recidivism. No reason supports the analysis that one who continues to flout the law should, after a period of time, be treated as if he were an innocent bungler unaware of the seriousness of law violation. We hold that anyone who violates the law of 1961, after having already been convicted of a violation, shall be subject to the increased penalty of his subsequent offense occurring within one year after the conviction of the next preceding offense. To illustrate, if a person is convicted of his first offense on January 1, 1967, of his second offense on July 1, 1967, and his third offense on January 2, 1968, he would be subjected to the increased penalty for the offense of January 2, 1968, even though a year had passed since his first offense of January 1, 1967.

In his dissenting opinion, Justice COHEN introduces a matter wholly extraneous to the issues involved in this appeal. In so doing, he makes critical observations on an action taken by Justice MUSMANNO in a situation factually related, but not jurisprudentially pertinent, to the questions advanced in this appeal.

Justice MUSMANNO replies to Justice COHEN in Appendix A, which immediately follows this Opinion.

The decree of the Court of Common Pleas of Beaver County is affirmed.

Mr. Justice JONES and Mr. Justice EAGEN concur in the result.

---

APPENDIX A

Reply by Justice MUSMANNO to Statement by Justice COHEN

Justice COHEN has filed an opinion entitled "Opinion Vacating Decree". In that opinion, toward the end thereof, he introduces a statement about a matter which is of no more relevance to the issue in this case than is the rainfall of Kalamazoo. However, since he has introduced the statement and it will be printed in the State Reports, I find myself, as Senior Associate Justice of this Court, compelled, in order that the readers of the State Reports may not be led astray, to point out what, in Justice COHEN'S statement, is rain, and what is mist and myth.

It would appear from Justice COHEN'S statement that he must have read the record in this case through impervious glasses or in a drenching downpour. Otherwise he could not have failed to see that it was agreed in the court below by all the parties involved in the litigation, that, pending disposition of the issue of constitutionality of the controverted Act of 1961, there would be no arrests in Beaver County under the Act. I quote from the record: "Mr. Masters: [District Attorney] We have agreed, your Honor, until such time as the constitutionality of this act is determined we will not harass or make any threats or arrest anyone in regard to this particular operation until such time as this Preliminary Injunction hearing has been com-

pleted and until the constitutionality has been determined. I add that originally the County Detective's Office did make threats that there would be arrests made, but now since this action has been filed and the matter has to be—the constitutionality of the act has to be determined, we will refrain from any arrests being made until such time as the act is—the constitutionality of the act has been determined. The Court: You will also use the prerogatives of your office so far as emphasizing this to local, municipal and other officials? Mr. Masters: I will advise all of the law enforcement agencies named as Defendants in this law suit, being not only the County Detectives but the State law enforcement officers and the municipal officers, that the matter is pending before the Court and until the constitutionality is determined no arrests shall be made."

Now, it is as clear as the skyline of Kalamazoo, after the rain, that all the law enforcement authorities in Beaver County, with the approval of the presiding Court, officially asserted in open Court that there would be no arrests in Beaver County under the Act of 1961 until its constitutionality was decided by the Court which had the authority to decide it, namely, this Court.

In addition to failing to note the contents of the record in this case, Justice Cohen, in his eagerness to study weather precipitation in Kalamazoo, ignored what is a matter of judicial notice, namely, that the Court of Common Pleas of Allegheny County has also restrained the District Attorney of Allegheny County from enforcing the Act of 1961 until this Court passes on its constitutionality.

All this is a matter of common knowledge. In spite of this universal notice on the judicial state of affairs appertaining to the Act of 1961, a W. L. Clark in Beaver County filed three separate informations against

John Bertera, President of Bertera's Hopewell Foodland, Inc., charging him with violation, on October 15, 1967, of the Act of 1961. The arguments on the appeal taken by the appellant in the instant case were heard on September 27, 1967. Thus, although Mr. Clark knew that Mr. Bertera, as president of Bertera's Hopewell Foodland, Inc., was actually involved in the case pending before the Supreme Court, he instituted criminal proceedings against Bertera. This, obviously, he had no right to do. This, obviously, amounted to defiance of the courts of Beaver County and of the Supreme Court of Pennsylvania, actually holding jurisdiction over the very subject matter Clark was now trying to re-litigate before a justice of the peace court.

On October 18, 1967, John Bertera averred under oath the facts above recited and his attorney filed in the Supreme Court of Pennsylvania, Western District (Pittsburgh, where I have my judicial chambers) a petition for a writ of prohibition against Justice of the Peace Otto Hughes who had ordered the arrest of Bertera and who had expressed his purpose of holding a hearing on the informations on Friday, October 20, only two days away.

It was necessary to act at once, if the integrity of litigation before this Court was not to be collaterally attacked. The situation demanded immediate attention if the prestige of the Supreme Court of Pennsylvania was not to be lowered. Certainly a justice of the peace could not re-arrest a defendant whose conviction was on appeal. Certainly no lower court could order execution of a defendant while his appeal is pending before a high Court, and no judge could be called a judge if he did not use the power of his office to prevent an illegal execution. It must be emphasized that the defendant in the criminal proceedings in Beaver County was the *same person* involved in the proceedings in the Supreme Court. It must be reiterated that the *same*

*question* was involved in both courts, namely, the constitutionality of the Act of 1961.

Since my Supreme Court chambers are located in the same building which houses the office of the Prothonotary of the Western District of this Court, the petition for writ of prohibition was brought to me. After I studied the documentation I telephoned the Chief Justice in Philadelphia and made a report on what was before me. I recommended that the writ be granted. He agreed with my recommendation. I said that I would send the papers to the Chief Justice for action. The Chief Justice said that since I had the papers I should sign the order. And I did so.

Justice COHEN somehow finds objection to this. I believe the situation demanded immediate action. Otherwise the defendant could have been committed to jail over the weekend, while his case was being considered by the highest Court in the Commonwealth. The prospect of a litigant in the Supreme Court of Pennsylvania being jailed by a justice of the peace, while his case is in the Supreme Court, is so fantastic and bizarre that I wonder why Justice COHEN, no matter how hard it is raining in Kalamazoo, cannot see it.

There are times when a judge, if he has any appreciation of the responsibilities of his office, must act at once to save the liberties of the people and perhaps even their lives. A Judge is a Judge.

Justice COHEN himself acted on this principle in a case where intervention was far less demanding than here. On May 18, 1964, there was presented to the Supreme Court, Middle District (in Harrisburg), a motion for a temporary restraining order on behalf of a certain Stanton A. Berkowitz. In some manner not apparent in the record the petition got to Justice COHEN who lives in York, Pennsylvania. Justice COHEN entertained jurisdiction at once. He did not grant a rule to show cause, he did not consult a single member of

the Court, he did not give the respondent an opportunity to file an answer. Justice COHEN, without batting an eye or turning a page of the Rules of Civil Procedure, dipped his pen into the inkwell and, in a bold hand which would have done credit to the signature of John Hancock, signed the order attached to the petition. What did this order command? This was not a simple prohibition on a justice of the peace, who, minor though he may be, is still part of the State's judiciary. Justice COHEN projected his authority into a wholly different department of the State, the Executive Department.

Justice COHEN flashed an order on a member of the Governor's Cabinet, the Secretary of Health. Peremptorily he told the Secretary of Health that he could not fire one of his employees, the Stanton A. Berkowitz above mentioned. It was possible that the Secretary of Health wished to fire Berkowitz because he believed Berkowitz was incompetent to operate the Henry R. Landis State Hospital, of which he was institutional business manager. There was nothing in the motion for temporary restraining order which excluded the possibility that Berkowitz's presence in the hospital was perilous to the well-being of the sick patients. Justice COHEN nevertheless imperiously ordered the Secretary of Health not to fire Berkowitz.

The writ of prohibition I signed may have saved Bertera from a couple days' jail. Justice COHEN's restraining order could have depopulated the hospital, if Berkowitz was infected with a contagious disease, which could not be excluded, so far as the record shows. The petition for the restraining order simply said that Berkowitz was a civil service employee and could not be dismissed, but no civil service regulation prevents an administrator from restraining or taking off the job someone who has become irresponsible. Justice COHEN had no way of determining whether the dismissal was due to politics or a plague.

Justice COHEN did, in his impetuous, self-generated, nonconsulting order, state that the Secretary of Health would be allowed nine days hence to present his case against Berkowitz but, in nine days, the hospital, if it was being badly administered by Berkowitz, could have killed off all its patients.

And so, reverting to the rainfall of Kalamazoo, what has Justice COHEN established by his introducing into his opinion a matter which can have no bearing on the constitutionality of the Act of 1961?

One other matter needs to be mentioned. Justice COHEN entitles his opinion—OPINION VACATING DE-CREE. This is incorrect. An opinion cannot vacate a decree. The opinion can be an Opinion on Vacation of a Decree, but it cannot vacate a decree. But this is something for Kalamazoo grammarians to determine. Anyhow, in that awkwardly entitled Opinion Vacating Decree, Justice COHEN says in footnote No. 1.: "Rule 235 of the Pa. R. C. P. requires notice to the Attorney General when an Act of Assembly is alleged to be unconstitutional and the Commonwealth is not a Party. The record does not disclose that Rule 235 was complied with. It would be most unfortunate to permit an adverse ruling on the constitutionality of an Act of Assembly to be made without notice to the Attorney General."

The fact of the matter is that, contrary to Justice COHEN's ipse dixit, the District Attorney of Beaver County did comply with the Rules of Civil Procedure. And if Justice COHEN, before his foray into Kalamazoo, had attentively read the record he would have found, on page 20a thereof: "Mr. Masters [District Attorney of Beaver County] : At the outset, your Honor, I would like to place upon the record that at the conclusion of the last hearing the Honorable Judge asked me to inform the Attorney General's office to see if they had any interest in this matter, and immediately upon

leaving the courtroom I advised the Attorney General as to the proceedings and as to the date and as to what was involved, and to this date I have received no answer or no reply from the office of the Attorney General."

And so, Justice COHEN's tempest in a fish bowl or a storm in a teacup has, we hope, been stilled.

———

CONCURRING OPINION BY MR. CHIEF JUSTICE BELL:

The amended Act of September 27, 1961 is difficult to interpret because parts of it are so indefinite and vague. The Act provides:

"No. 696

"AN ACT

"Amending the act of June 24, 1939 (P. L. 872), entitled 'An act to consolidate, amend and *revise the penal laws** of the Commonwealth,' prohibiting certain business activities on Sunday.

"Section 1. The act of June 24, 1939 (P. L. 872), known as 'The Penal Code,' is amended by adding, after section 699.14 [699.13 in original], a new section to read:

"Section 699.15. Selling or Otherwise Dealing in Fresh Meats, Produce and Groceries on Sunday.—Whoever engages in the business of selling or otherwise dealing at retail in fresh meats, produce and groceries on Sunday shall, upon conviction thereof in a summary proceeding for the first offense, be sentenced to pay a fine of not exceeding one hundred dollars ($100), and for the second or any subsequent offense committed within one (1) year after conviction for the first offense, be sentenced to pay a fine of not exceeding two hundred dollars ($200) or undergo imprisonment not exceeding thirty (30) days in default thereof.

———

* Italics throughout, ours.

"Each separate sale, or offer to sell, shall constitute a separate offense.

"Informations charging violations of this section shall be brought within seventy-two (72) hours after the commission of the alleged offense and not thereafter.

"This section shall not apply to any retail establishment employing less than ten persons or to any retail establishment where fresh meats, produce and groceries are offered or sold by the proprietor or members of his immediate family or employing less than ten persons nor shall it apply to any retail establishment where food is prepared on the premises for human consumption."

I believe this amendment of The Penal Code, including the first two exemptions, is Constitutional and (1) does not violate (a) the Equal Protection Clause or (b) the Due Process Clause of the Fourteenth Amendment, and (2) does not constitute a law respecting the establishment of religion within the meaning of the First Amendment (which is made applicable to the States by the Fourteenth Amendment) and (3) does not amount to invidious discrimination or unreasonable classification.

An Act is presumed to be Constitutional, and may not be declared Unconstitutional unless it violates the Constitution clearly and plainly.* *Rubin v. Bailey,* 398 Pa. 271, 157 A. 2d 882; *Allentown School District,* 370 Pa. 161, 87 A. 2d 480; *Evans v. West Norriton Township,* 370 Pa. 150, 87 A. 2d 474.

Although the Act is poorly drawn, the objectives and purposes of this Act, viz., "selling or otherwise dealing at retail in fresh meats, produce and groceries on Sunday," were, under prior decisions of this Court and prior decisions of the Supreme Court of

---

* Frequently expressed "clearly, palpably and plainly."

the United States (which I am compelled to follow), (1) secular* in nature and (2) such classification is reasonable. That Court justifies its conclusions and decisions on the ground that the reason, purpose and objective of virtually every Sunday Closing Law** is to provide a uniform day of rest, recreation, peace and repose for all citizens, with certain permissible or necessary exceptions. *McGowan v. Maryland*, 366 U.S. 420; *Two Guys v. McGinley*, 366 U.S. 582; *Braunfeld v. Brown*, 366 U.S. 599; *Bargain City U.S.A., Inc. v. Dilworth*, 407 Pa. 129, 179 A. 2d 439; *Rubin v. Bailey*, 398 Pa., supra.

We start with the well settled principle that the Legislature may validly and Constitutionally enact a law to prohibit all worldly business on Sunday, with the exception of necessities or acts of charity. *Two Guys v. McGinley*, 366 U.S. 582, supra (pages 590 et seq.); *Commonwealth ex rel. v. American Baseball Club of Phila.*, 290 Pa. 136, 138 A. 497, and cases cited therein; *Commonwealth v. Nesbit*, 34 Pa. 398; *Johnston v. Commonwealth*, 22 Pa. 102; *Specht v. Commonwealth*, 8 Pa. 312; *Commonwealth v. Bauder*, 188 Pa. Superior Ct. 424, 145 A. 2d 915, affirming 14 Pa. D. & C. 2d 571; *Commonwealth v. Taber*, 188 Pa. Superior Ct. 415, 145 A. 2d 908, affirming 14 Pa. D. & C. 2d 591.

Moreover, because the penalties for violations are so severe and repetitive and would cause plaintiff ir-

---

* These decisions admit that the origin of the Act was undoubtedly religious and I personally believe that its principal purpose and objective is still primarily and principally religious. This is crystal clear from the original §699.4 of The Penal Code of 1939, which provides (P. L. 952): "Worldly Employment or Business on Sunday. —Whoever does or performs any worldly employment or business whatsoever on the Lord's day, commonly called Sunday (works of necessity and charity only excepted) . . .".

** Sometimes called "Sunday Blue Laws".

reparable loss to his business and there is *no adequate* remedy for a person accused of or arrested for a violation of this Act except in Equity, Equity has jurisdiction. *Kingsley International Pictures Corp. v. Blanc,* 396 Pa. 448, 456, 153 A. 2d 243; *Adams v. New Kensington,* 357 Pa. 557, 560-561, 55 A. 2d 392; *Duquesne Light Co. v. Upper St. Clair Township,* 377 Pa. 323, 341, 105 A. 2d 287; *Harris-Walsh, Inc. v. Dickson City Boro.,* 420 Pa. 259, 264, 216 A. 2d 329. See, also, *Rubin v. Bailey,* 398 Pa., supra; and *Bargain City U.S.A., Inc. v. Dilworth,* 407 Pa., supra.

In *Kingsley International Pictures Corp. v. Blanc,* 396 Pa., supra, the Court, quoting from *Adams v. New Kensington,* 357 Pa., supra, said (p. 456) : " 'But equity does have jurisdiction to enjoin such a [criminal] prosecution where it is alleged not only that the statute or ordinance is unconstitutional and void but that its enforcement would cause the plaintiff irreparable loss to his property, either by effecting, if not a total suppression of his business, at least a grave interference therewith, or by subjecting him to the imposition of cumulative, exorbitant and oppressive penalties pending judicial determination of the validity of the legislation. In such cases, the ground of equitable jurisdiction is the protection of property rights, and the fact that a criminal proceeding is involved is merely incidental [citing cases].' "

It is hornbook law that a legislature has the power to establish reasonable classifications, provided they have a reasonable basis and are not unjustly discriminatory. The test as to whether an Act is unconstitutional because it is unjustly discriminatory, or constitutes class legislation, or is an unconstitutional classification, is whether the classification is reasonable and is founded upon a real or genuine and not an artificial or arbitrary distinction. *Chartiers v. Allegheny County Board,* 418 Pa. 520, 539-540, 211 A. 2d

487; *Kurtz v. Pittsburgh,* 346 Pa. 362, 31 A. 2d 257, and cases cited therein.

Although not mentioned in the Majority Opinion or in any of the Dissenting Opinions, this Sunday Closing Act is a *criminal* statute and therefore must be *strictly* construed against the Commonwealth. Statutory Construction Act, May 28, 1937, P. L. 1019, §58(1); *Commonwealth v. Derstine,* 418 Pa. 186, 210 A. 2d 266; *Commonwealth v. Glover,* 397 Pa. 543, 156 A. 2d 114. So construed, I would limit the language of the Act and the interpretation of its exemptions (1) to retail establishments which throughout the week, as well as on Sunday, employ less than ten persons, and (2) to family operated small retail stores, and I would include in the "immediate family" husband, wife, children, grandparents, brothers and sisters, uncles, aunts, nephews and nieces, and (3) to retail establishments where food consisting of meats, produce and groceries are prepared on the premises for human consumption.

I believe the words "retail establishments" in the third exemption were intended to exempt small stores which sell at retail fresh meats, produce and groceries, such as delicatessen and grocery stores, but were not intended to exempt restaurants. However, this particular exemption clause is so vague and indefinite and uncertain that this third exemption cannot be Constitutionally sustained. With this execption, I would sustain the Constitutionality of the Act.

---

CONCURRING OPINION BY MR. JUSTICE ROBERTS:

Despite an opinion laced with support for the small businessman, love for the family, and reverence for the Sabbath, the opinion announcing the judgment of this Court totally fails to resolve, discuss, or even isolate the most important issue here presented: Does

a statute which permits grocery stores employing less than ten people to open on Sunday, but which compels other grocery stores employing more than that number to close, violate the equal protection clause of the Constitution of the United States? In my opinion, an adequate answer to a question of this magnitude requires more than the conclusory assertion "a line must be drawn somewhere." Furthermore, a study of the cases in this area convinces me that the statute here challenged *is* constitutionally infirm.

I shall assume that the raison d'etre for §1 of the Act of September 27, 1961, P. L. 1695, 18 P.S. §4699.15, is, as stated by the majority,[1] to eliminate the "traffic congestion, unbearable noises, and a general condition wholly violative of the intent and purpose of the Sunday Closing Laws." I am also aware that this Court should follow the holding in *Two Guys v. Mc-Ginley*, 366 U.S. 582, 81 S. Ct. 1135 (1961), in which the Supreme Court of the United States sustained, against an equal protection argument, our Act of August 10, 1959, P. L. 660, §1, 18 P.S. §4699.10 which interdicted the Sunday sale of certain products by any store, regardless of size. Nevertheless, I believe that *Two Guys* is distinguishable from the present case, and also that the statute here under attack will not accomplish the very purpose which the majority advances as the sole reason for its enactment.

Admittedly, the statute involved in *Two Guys* was carefully drafted to include those items usually sold by large discount department stores whose business activities on Sunday did indeed disrupt the peace and tranquility normally associated with our day of rest. However, unlike the present statute, the *Two Guy's* prohibition was aimed at *all* stores which sold the list-

---

[1] For purposes of convenience, I shall hereafter refer to Mr. Justice MUSMANNO's opinion as the majority opinion although it represents the views of only one Justice.

ed items, not just the larger establishments. Why, we might ask, did the Legislature resort to an "overkill" statute, when it was concerned with an evil perpetrated only by the big-volume operators? To me the answer is clear. It is one thing to say, as the Supreme Court in *Two Guys* did say, that it is "within the power of the legislature to have concluded that these businesses [discount department stores] were particularly disrupting the intended atmosphere of the day because of the great volume of motor traffic attracted, the danger of their competitors also opening on Sunday and their large number of employees." 366 U.S. at 591, 81 S. Ct. at 1140. But it is quite another thing to use this rationale as a lever to give a competitive boost to smaller establishments. For the Legislature to decide that supermarkets, as well as discount stores, disrupt the desired Sunday atmosphere, is to legislate within the rationale of *Two Guys*. Yet, when the statute exempts the corner grocery store from its prohibition, we inject the element of economic discrimination into our Sunday closing law, and thus create an entirely different situation from that faced by the Supreme Court in *Two Guys*.

By the great weight of authority, other state appellate courts that have been called upon to pass on Sunday closing laws which distinguished between establishments selling the same products have found such laws violative of the equal protection clause. For example, in *Terry Carpenter, Inc. v. Wood*, 177 Neb. 515, 129 N.W. 2d 475 (1964), the Nebraska Supreme Court unanimously invalidated a Sunday closing law that exempted stores employing not more than two people. That court did not even suggest that the Nebraska legislature could have had any constitutionally valid purpose in making this economic discrimination. A statute exempting selected coastal counties in New Jersey met with a similar fate before the Superior Court of

58

that state. *Sarner v. Union Twp.*, 55 N.J. Super. 523, 151 A. 2d 208 (1959).[2]

The most frequently voiced equal protection argument based on economic discrimination has come in response to those closing laws whose exemptions result in permitting certain *types* of stores to open on Sunday and sell the same merchandise that neighboring stores, which are shut down, cannot sell. Although there is a split of authority in this area, a clear majority of the states have held their respective statutes violative of the equal protection clause of the Constitution of the United States. Two Illinois cases illustrate that the test in that state is whether the closing law gives a competitive advantage to one business over another. In *City of Mt. Vernon v. Julian*, 369 Ill. 447, 17 N.E. 2d 52 (1938), a closing ordinance was declared unconstitutional when it appeared that its exemptions permitted, inter alia, a grocery store to remain open and sell tobacco, while forcing a tobacco shop to close. Conversely, in *Humphrey Chevrolet v. City of Evanston*, 7 Ill. 2d 402, 131 N.E. 2d 70 (1955), an ordinance

---

[2] The efficacy of this holding has in no way been undermined by *McGowan v. Maryland*, 366 U.S. 420, 81 S. Ct. 1101 (1961). The Supreme Court in *McGowan* did uphold a Sunday closing law that exempted the sale of certain recreational items by those merchants who operated bathing beaches or amusements parks in Maryland's resort county of Anne Arundel. However, the geographic distinctions made in that statute did not extend to all merchandise, as in *Sarner*. Moreover, the Anne Arundel provisions were clearly relevant to the legitimate legislative purpose of keeping bathing beaches operative and thus foster the recreational aspects of Sunday. In *Sarner*, any such legitimate purpose was obliterated by the carte blanche permission given to certain merchants to sell *anything* on Sunday as well as the senseless discrimination between different resort counties in New Jersey. Whether Anne Arundel County is the only Maryland resort county or whether, in fact, it was also the recipient of favorable legislative discrimination, as were the exempt counties in New Jersey, need not concern us here, for it was never argued, and hence never faced in *McGowan*.

aimed at certain *commodities*, rather than the stores themselves, withstood attack by an automobile dealer when the court noted that *nobody* could sell cars on Sunday.[3]

There is one area, however, where an economically discriminatory closing law will be sustained. Significantly, in all the cases heretofore cited, state courts have noted that no valid legislative purpose could be found to sanction the economic schism produced by the statute. But where the facts are such that the economic discrimination *itself* is necessary to effectuate a state's legitimate dual interest in both lessening Sunday congestion and also increasing recreation, then the law may stand. Such a factual framework supports the holding in *McGowan v. Maryland*, 366 U.S. 420, 81 S. Ct. 1101 (1961). The Maryland statute, see footnote 2, supra, permitted the operators of bathing beaches and amusement parks in Anne Arundel County to sell merchandise incidental to the operation of those establishments.[4] Thus, the defendant discount

---

[3] See also *Nation v. Giant Drug Co.*, 396 P. 2d 431 (Wyo. 1964) (holding unconstitutional a closing law whose effect was, inter alia, that grocery stores could sell bread but bakeries could not, that drug stores could sell candy, but candy stores could not, and that gas stations could sell tires, but tire stores could not); *Broadbent v. Gibson*, 105 Utah 53, 140 P. 2d 939 (1943) (facts similar to *Giant Drug*, supra); *State v. Karmil Merchandising Corp.*, 158 Me. 450, 186 A. 2d 352, 365-66 (1962) (in upholding closing law, court was very careful to point out that the stores permitted to open were *not* engaged in the same business as respondent-department stores); *City of Hot Springs v. Gray*, 215 Ark. 243, 219 S.W. 2d 930 (1949) (semble). Contra, *Charles Stores Co. v. Tucker*, 263 N.C. 710, 140 S.E. 2d 370 (1965); *Kirk v. Olgiati*, 203 Tenn. 1, 308 S.W. 2d 471 (1957).

[4] The opinion in *McGowan* indicates that the Maryland statute now contains an additional exemption for Anne Arundel stores employing not more than one person other than the owner. 366 U.S. at 423, 81 S. Ct. at 1103. However, since that amendment was added *after* the defendants were indicted, they did not argue that

store, for example, could not sell suntan oil or rubber ducks on Sunday, although these identical items could be sold at bathing beaches. In sustaining this act, Mr. Chief Justice WARREN stated: "Here again, it would seem that a legislature could reasonably find that these commodities, necessary for the health and recreation of its citizens, should only be sold on Sunday by those vendors at the locations where the commodities are most likely to be immediately put to use." 366 U.S. at 427-28, 81 S. Ct. at 1106.

The necessity for this minimal economic discrimination is plain. The Legislature, of course, has the power to pass legislation encouraging the use of a state's recreational facilities on Sunday. But, the use of these facilities might be diminished if the public could not purchase, on the spot, the many and varied commodities needed to make the day of rest indeed restful. Furthermore, at best a minimal increase in traffic would result from the opening of a beachfront sundry store, since even the laziest of bathers would hardly use his car to travel from beach blanket to counter. On the other hand, if *all* stores could remain open to sell these supplies on Sunday, the traffic congestion could well exceed even the weekday flow, given the addition of beach traffic to the normal rush of shoppers.

The majority in the present case would have us believe that the *economic discrimination* in our statute is also necessary to decrease Sunday traffic while, at the same time, feed our population. I not only fail to share the majority's concern over the imagined starvation of our citizenry if small grocery stores could not open on Sunday, but furthermore, as I read the present exemption for stores employing less than ten people, this statute might not even decrease traffic!

---

*it* was also unconstitutional. Accordingly, the Court did not pass on, or even discuss, this exemption.

Although the majority insists that, if an establishment employs more than ten persons during the week it cannot open on Sunday with a staff of less than ten, the statute does not dictate this result. At best, the statute is silent on this question. It is therefore equally reasonable (if not more reasonable, since the statute is directed against Sunday sales) that any store may open on Sunday if it employs less than ten persons on that day. Thus, I find nothing in this closing law to prevent a large supermarket from opening on Sunday, staffed for that day only by a manager and eight checkout cashiers, or perhaps by a butcher, a manager and seven cashiers. The point is simply this. In the case of a supermarket which does not, even during the week, employ a traditional sales staff, it is not the number of employees which determines whether people will shop there on Sunday, but rather the availability of the merchandise itself which controls. I am not necessarily suggesting that supermarkets, for a *certainty,* will open on Sunday with skeletal staffs. I merely point out that the language in *McGowan* requires the very *clearest* showing that economic discrimination will *further* a legitimate state interest before this, or any other court, may countenance such discrimination in a Sunday closing law. Absent such a showing, the present case is indistinguishable from all those in which similar legislation has been struck down.

Ironically, if the majority is so concerned about the flow of traffic on Sunday, this flow would be best decreased if the first two exemptions in 18 P.S. §4699.-15 were eliminated. (I share the majority view that the third exemption is properly limited to restaurants or "take out" stores, and thus do not suggest that it is unconstitutional.) Contrary to the majority's position, I am certain that the elimination of these two exemptions would not invalidate the entire section with

the resulting opening of all supermarkets on Sunday, but would instead force them *all* to close. The Act of May 28, 1937, P. L. 1019, §55, 46 P.S. §555, provides that every statute shall be severable unless the court finds that the Legislature would not have enacted the law without the missing language, or that, without it, the statute is incomplete. Neither of these dangers are present here.

Clearly the statute would be complete without the exemptions. In fact, without them, the section merely has the effect of adding fresh meats, produce and groceries to the list of completely prohibited items for Sunday sales already set out in 18 P.S. §4699.10 and upheld in *Two Guys*. Moreover, to conclude that without the exemption for small stores and family stores, the Legislature would not have enacted this section is to exalt the questionable economic discrimination present in this statute *over* the legitimate state interest in Sunday's tranquility—an exaltation that I would be loathe to ascribe either to our lawmakers or my brethren.

For all the foregoing reasons I firmly believe that the first two exemptions contained in this section violate the equal protection clause of the Fourteenth Amendment to the Constitution of the United States; and without constitutional sanction these exemptions cannot possibly stand, supported merely by the maxims advanced by the majority. However, despite my conclusion that two of the exemptions are unconstitutional, I concur in the majority's[5] result because in my view no establishment may sell groceries on Sunday. Thus, the court below properly denied relief to appellant.

OPINION BY MR. JUSTICE COHEN:

The majority apparently sanctions the appellant's resort to the courts of equity to restrain a criminal

---

[5] See footnote 1, supra.

prosecution. Generally, our courts have been diligent in preventing the use of equity in the restraint of criminal prosecutions. We require that there be not only a substantial question regarding the constitutionality of the statute, but also a showing that its enforcement would cause irreparable damage to property.

Applying that rule to the present situation, Bertera complains that even though the Act of June 24, 1939, P. L. 872, §699.4, 18 P.S. §4699.4, and the Act of September 27, 1961, P. L. 1695, §1, 18 P.S. §4699.15 make it a crime to engage in certain businesses on Sunday, nevertheless, he has a large investment in his store which was made in the expectation of being able to operate that store on Sunday. He further alleges that the Act of 1961 permits certain retail establishments (not his) to operate on Sunday. Hence, he says, the Act is unconstitutional as to him.[1]

If the Act of 1961 were wholly unconstitutional, Bertera would then be subject to prosecution under the Act of 1939, P. L. 872. If the Act of 1961 is not totally unconstitutional, but the exemption is an unconstitutional exemption, the Act would be in effect without the exemption, and there is no allegation on Bertera's part that the Act without the exemption is unconstitutional. Consequently, he would be prohibited from engaging in business regardless of the constitutionality of the exemption in the 1961 Act; and the proposed enforcement of the Sunday Closing

---

[1] In *Bargain City U.S.A., Inc. v. Dilworth*, 407 Pa. 129, 179 A. 2d 439 (1962), and *Rubin v. Bailey*, 398 Pa. 271, 157 A. 2d 882 (1960), our Court held that the Sunday closing laws were not violative of the Constitution of the Commonwealth. These two decisions and the United States Supreme Court decision in *Two Guys*, infra, demonstrate that the constitutional validity of the Sunday closing laws has not been sufficiently impugned by the complaint filed here to warrant the intrusion of equity in the restraint of criminal prosecution.

Laws cannot under any circumstances be considered an unconstitutional interference with his business. Thus, Bertera's position is unsound. Our Sunday laws generally have been upheld against constitutional attack. *Two Guys v. McGinley*, 366 U.S. 582, 81 S. Ct. 1135, 6 L. ed 2d 551 (1961), *Braunfeld v. Brown*, 366 U.S. 599, 81 S. Ct. 1144, 6 L. ed 2d 563 (1961). Therefore, I take it that Bertera cannot successfully maintain that he could operate on Sunday without violating one or more constitutionally valid statutes. Even if the exemption contained in the Act of 1961 were invalid, the only result of striking it down would be to leave the Act in effect without the exemption, thus prohibiting Bertera from opening in any event. I see no substantial question of constitutionality here which justifies equity in assuming jurisdiction. Under these circumstances it is unnecessary even to consider the extent of harm to Bertera's business.

I would vacate the decree of the court below and remand this proceeding to that court with instructions to dismiss the complaint for want of jurisdiction.

I regret that there is another aspect of this litigation which requires comment. While our Court had this case under consideration, a petition for a writ of prohibition was filed on Bertera's behalf; and without notice to or answer by the parties sought to be restrained, the following order was entered:

"Now, this 18th day of October, 1967, upon presentation of the foregoing Petition for Writ of Prohibition, it is ordered and directed that such Writ be issued and that: (a) Justice of the Peace Otto Hughes is enjoined and prohibited from holding a hearing on the informations filed with him by Woodrow L. Clark charging John Bertera with violating the 1961 Statute of the Sunday Blue Laws, Section 699.15 added September 27, 1961, P. L. 1695. . Sec. 1 (18 P.S. Sec. 4699.-15) while the constitutionality of said statute. is under

challenge and pending in this Beaver County Test case. (b) Justice of the Peace Otto Hughes and all other Justices of the Peace in Beaver County, Committing Magistrates and persons entitled to act in the capacity of Committing Magistrates in Beaver County, who being similarly situated, constitute a class, and whose numbers make it impracticable to name are enjoined and prohibited from taking any information from any persons whatsoever for alleged offenses under the 1961 Statute of the Sunday Blue Laws Section 699.15 added September 27, 1961, P. L. 1695. Sec. 1 (18 P.S. Sec. 4699.15) while the constitutionality of said statute is under challenge and pending in this Beaver County test case.

BY THE COURT:

MUSMANNO

*Justice of the Supreme Court of Pennsylvania"*

The entry of this order was not the action of the majority of our Court but was the unilateral act of one member. No individual member of our Court has the power to issue a writ of prohibition, just as no individual member of our Court has the power to quash an appeal, grant a new trial, or affirm or reverse a lower court's judgment.

In *Schlesinger Petition,* 367 Pa. 476, 81 A. 2d 316 (1951), Chief Justice DREW, in reviewing the proceedings followed when a petition for writ of prohibition is filed, stated on page 479: "On May 29, 1951, the petitioner [Schlesinger] filed this petition for a writ of prohibition, and we, on the same day, granted a rule on Judge MUSMANNO to show cause, returnable June 4, 1951, and stayed all proceedings until further order of this Court."

In *Dauphin County Grand Jury Investigation Proceedings (No. 2),* 332 Pa. 342, 343, 2 A. 2d 802 (1938), the proceedings pertaining to the issuance of a writ of

prohibition were described as follows: "The chairman of the House Investigating Committee then filed a petition in the Supreme Court for a writ of prohibition. A rule to show cause was granted by the Supreme Court, and proceedings were stayed pending the disposition of the case. A return to the rule was filed by the presiding judge. . . ."

In both cited cases and in every case published in our Reports, the courts have followed the correct procedure; that is, upon the filing of a petition for a writ of prohibition, the court grants a rule on the party sought to be restrained, thus giving the party an opportunity to answer. The Court may or may not stay proceedings pending disposition or further order. After the party sought to be prohibited files his return to the rule, the Court, *not a single member thereof,* either without or after oral argument determines whether the writ should issue. This is the only proper and constitutional procedure upon application for a writ of prohibition.[2]

---

[2] The procedure in the case of *Berkowitz v. Wilbar*, 416 Pa. 369, 206 A. 2d 280 (1965), may be summarized as follows:

On January 9, 1958, Berkowitz's position at the Henry R. Landis State Hospital was established as one within the "classified service" category. On November 1, 1963, Berkowitz received notice from the Director of Personnel of the Department of Health, at the instance of the Governor of the Commonwealth, that his status had been changed to place him in the category of "unclassified civil service." On April 24, 1964, Berkowitz was notified by letter that his employment with the hospital was to terminate on May 12, 1964.

On May 1, 1964, Berkowitz appealed to the Commission contending that his change to "unclassified civil service" was illegal. The Commission determined that since he was in the "unclassified service" he had no right to a hearing. Berkowitz then filed a complaint in equity in the Commonwealth Court on May 12, 1964, against the Secretary of Health of the Commonwealth of Pennsylvania seeking a preliminary injunction to restrain the Secretary from dismissing him from his position with the hospital. The

DISSENTING OPINION BY MR. JUSTICE O'BRIEN:

I cannot subscribe to the conclusion reached by the majority of this court that the amendment to the Act of 1939, June 24, P. L. 872 §699.4, 18 P.S. §4699.4, enacted by the General Assembly as the Act of 1961, September 27, P. L. 1695 §1, 18 P.S. §4699.15, is constitutional. In reaching my conclusion, I need only heed the admonition of the majority and apply "common sense in the construing of words according to rules of grammar and according to their common and approved usage".

Clearly, the mere fact that all of the judges of the highest appellate court of the Commonwealth are unable to agree on the meaning of the legislative enactment, even with the aid of the Statutory Construction Act and all their experience in the interpretation of statutes, does not indicate that the statute is unconstitutional for vagueness. The fact of this disagree-

Court denied the injunction and Berkowitz took an appeal to our Court.

On May 18, 1964, I issued an order restraining the Secretary of Health from dismissing Berkowitz from his position and from interfering with or denying him any rights guaranteed him under the Civil Service Act and that such order should continue until argument on the restraint on May 26, 1964. Every member of our Court was notified by letter on May 18th as to the action taken in this matter. The order I issued staying Berkowitz's dismissal was dissolved.

On the appeal our Court held that Berkowitz's remedy was by way of an action of mandamus and not by an action seeking a preliminary injunction. Berkowitz instituted an action of mandamus to compel the Civil Service Commission to grant him a hearing. The Commonwealth Court issued an order directing the Commission to grant a hearing. The Commission complied and found the re-classification improper and ordered Berkowitz to be reinstated with back pay. After appeal to our Court, on January 6, 1967, our Court handed down an opinion affirming the Commission's order. *Wilbar v. Berkowitz*, 424 Pa. 154, 225 A. 2d 538 (1967).

ment does, however, indicate that the intendment of the statute is not so crystal-clear as the majority would have one believe. Even assuming, however, that the language of the statute admits of no interpretation other than that which the majority has reached, I conclude that the statute is void, since it is not based upon any reasonable or rational classification.

The statute involves attempts to do nothing other than prohibit the sale of fresh meats, produce and groceries on Sunday. At this point, there is nothing to be gained from any further discussion of the right of the Commonwealth to legislate in such fashion. The United States Supreme Court, as properly pointed out by the majority, in *Two Guys v. McGinley*, 366 U.S. 582 (1961), has foreclosed any such speculations. In that case, the Supreme Court of the United States held clearly that it is within the power of the state to conclude that retailers of certain items were particularly disrupting the intended atmosphere of the day because of the disturbances inherent in their operations. I would be remiss if I did not note in passing that this decision was based not upon any religious grounds, but wholly and solely upon the State's right to legislate for the economic well-being of its citizenry. I therefore find it unnecessary to make any comments relative to the majority opinion's preoccupation with the religious history of the Commonwealth and Nation. Such discussions are, in my view, irrelevant to the determination of the issues at hand.

The Act under attack says that: "Whoever engages in the business of selling or otherwise dealing at retail in fresh meats, produce and groceries on Sunday shall [be guilty of a violation and punished according to the Statute]. This section shall not apply to any retail establishment employing less than ten persons or to any retail establishment where fresh meats, produce and groceries are offered or sold by the

proprietor or members of his immediate family or employing less than ten persons nor shall it apply to any retail establishment where food is prepared on the premises for human consumption." I can readily accept the conclusion of the majority that a reasonable distinction can be made between establishments employing nine people and those employing ten or more. As aptly stated by the majority, the line must be drawn somewhere, and it requires no stretching of the rationale of *Two Guys* to reach the conclusion that the type of disturbances sought to be avoided justifies the classification. It is even arguable that where the proprietor or a member of his immediate family is engaged in the operation, an exception may be made.

This would be on the sole basis of protection of small, family enterprises against the competition of huge, competing enterprises. There is, however, no reasonable justification for excepting a retail establishment where food is prepared on the premises for human consumption, nor is there any valid justification for permitting an establishment to operate with an unlimited number of employees if only the proprietor or a member of his immediate family is engaged in the sale of fresh meat, produce and groceries.

From what I have just said, it is apparent that I do not agree with what the majority has held the statute to mean. For example, although the statute is totally ambiguous as to whether the "less than ten" exception means less than ten employees any day of the week or only on Sunday, the majority is certain that it means the former. If one interpretation had to be chosen, I would think the latter to be more logical. Since the Act is specifically directed to Sunday, the number of persons employed at any retail store on any day of the week other than Sunday would seem irrelevant to an interpretation of the statute. The Sunday closing laws have always tried to secure a

respite from work, a day of rest and recreation. If a store with 1,000 employees during the week employs only nine on Sunday, then a major purpose of the law has been fulfilled in securing that respite from work for 991 employees. Regardless of which interpretation is more logical, the point is that either is maintainable. This is a criminal statute which is being interpreted; to require those potentially affected to guess at its meaning violates fundamental notions of due process.

Nor can I agree with the majority's interpretation of the second exception of the Act, namely, that "This section shall not apply to any retail establishment . . . where fresh meats, produce and groceries are offered or sold by the proprietor or members of his immediate family or employing less than ten persons. . . ." The majority has come to the amazing conclusion that such an enterprise may not, in any event, employ more than nine persons. It is impossible for me to reach this conclusion except by ignoring completely the rules of grammar and the common and approved usage of the English language. The Act says that it shall not apply to a retail establishment where the items covered are offered or sold by certain people or to establishments employing less than ten persons. The language of the Statute is set out at length above, and it can be seen by a simple examination that the General Assembly saw fit to except from the provisions of the Act two separate and distinct types of retail grocery operations: those which employ fewer than ten persons and those where the proprietor or members of his immediate family are engaged in selling. The Act does not say that an exception is made for an establishment where the proprietor or a member of his family engages in selling and fewer than ten members are employed by the establishment; the Act says that an exception is made for any retail establishment which employs fewer than ten people, and a wholly separate

exception is made for any retail establishment where the proprietor or a member of his immediate family is engaged in selling. If these are not two separate and distinct classes of exceptions, there was no need for the Legislature to use the disjunctive "or" not once, but twice, to set off those establishments employing fewer than ten people.

The majority says that the fact that "or" is used *twice* to set off establishments employing fewer than ten people makes the second "or . . ." blatantly redundant unless we perform judicial alchemy to transform "or" into "and". The redundancy is undeniable; it merely emphasizes the defects in draftsmanship in this statute. Certainly the majority's reading of "or" as "and" does not remove the redundancy. If, as the majority concludes, family operated retail groceries are restricted to nine employees, then there is no need for the second exception of the statute. **The first exception** allowing the operation of establishments employing fewer than ten people would cover the field, and all of the subsequent language of the statute is mere surplusage. The family run store could employ help, so long as fewer than ten persons were working, under the first exception. Thus, reading "or" as "and" not only is a perversion of the English language, but one which ascribes to the General Assembly inclusion in a statute of language which is completely unnecessary.[1]

The very best that can be said for the second exception is that it is ambiguous. The majority states, by the tortuous alchemy we have referred to above, that the exception forbids the employment of more than

---

[1] In the cases cited by the majority where "or" was read "and", the legislative intent was clear. The transformations did not result in the statutes remaining just as confused as before the change was made. Nor did they broaden the scope of a criminal statute.

nine persons. It is just as reasonable to conclude that under this wording, an establishment could employ any number of employees, provided that the proprietor or members of his immediate family are engaged in selling, as it is to conclude that even where this condition exists, employees are limited to nine. It is just as reasonable to conclude that under this wording, an establishment could employ any number of persons, but only so long as they were the proprietor or members of his immediate family. It is not at all clear from the language of the Act which of the many interpretations advanced or advanceable was intended. What is clear is that the majority has seen fit to adopt the most restrictive of all the possible interpretations as the only one which the language of the Act permits.

Similarly, the majority takes a restrictive view as to what constitutes an "immediate family", asserting it to be husband, wife, and children. Should parents, or grandchildren, or perhaps nieces and nephews living in the household of the proprietor be included? No Pennsylvania case has defined "immediate family", but those from other states indicate that it has a broader meaning than that ascribed to it by the majority. One case has held that it includes a mother-in-law and father-in-law, *Grant-Morris Management Corp. v. Weaver*, 7 Misc. 2d 449, 166 N.Y.S. 2d 610, while another has indicated that a daughter-in-law, not even living with her husband's parents, may well be included within the term. *Cincinnatti, N. & C. Ry. Co. v. Peluso*, 293 S.W. 2d 556. That case cited Ballentine's Law Dictionary, defining immediate family as "those members of the same household who are bound together by ties of relationship". The questions raised by this vague term can only be answered by the legislature. The ambiguity should be fatal in a criminal statute.

In its interpretation of the third exception, "where food is prepared on the premises for human consumption", the majority repeats its error of assuming that its interpretation is the only plausible one. Such is surely not the case. "For human consumption", says the majority, clearly means "more or less, immediate human consumption". Disregarding the ambiguity in the majority's own use of "more or less", I ask what possible judicial omniscience can supply the word "immediate"? The legislature knew how to use that word when they wanted; in fact, they did so in referring to "immediate family" in the second exception. Although appellant raises the question whether "on the premises" modifies "prepared" or "consumption", I am inclined to agree with the majority that the placement of the modifier indicates the former. But I can by no means accept the majority's assertion that "slicing, cutting, dressing, trimming, cleaning, and packaging . . . is not preparation in the sense of the statute."

Moreover, I cannot accept the majority's interpretation that the food for sale must be prepared on the premises. The statute says that the section shall not apply *"to any retail establishment* where food is prepared on the premises for human consumption" (Emphasis added). Inasmuch as the statute by its title applies to grocery-type establishments—"Selling or otherwise dealing in fresh meats, produce and groceries on Sunday." it would seem that a supermarket which barbecued chickens or operated a delicatessen counter could employ an unlimited number of persons while its counterpart without the added feature would be limited to nine. This is a classification which is supportable on no grounds that I can conceive. Yet it hardly is a proper answer to avoid the irrational classification by giving the statute an interpretation its words will not yield.

I conclude that the Act is void for vagueness and I would therefore reverse the decree of the court below.

In view of the approach taken in some of the other opinions in this case indicating the result that would obtain if the exceptions were held to be void for vagueness, I would like to comment on that matter. I agree with the majority that the elimination of the exceptions would invalidate the entire section. They are so inextricably tied to the remainder of the statute that the statute is incomplete without them. However, this does not necessarily mean that all supermarkets could remain open on Sunday. It means that the validity of their opening must be tested under the provisions of the general Sunday closing law of June 24, 1939, P. L. 872, §699.4, 18 P.S. §4699.4.

I dissent.